# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERCED IRRIGATION DISTRICT, a California Irrigation District, | CASE NO. 1:12-cv-01645-LJO-SKO |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS THAT PLAINTIFF'S MOTION TO REMAND BE GRANTED** |
| v. | |
| COUNTY OF MARIPOSA, a political subdivision of the State of California, | **OBJECTIONS DUE:  14 DAYS** |
| Defendant. | |

_____/

## I.    INTRODUCTION

Plaintiff Merced Irrigation District ("MID") filed a declaratory relief action against the County of Mariposa ("Mariposa") in Merced County Superior Court on September 5, 2012.  On October 5, 2012, Mariposa removed Plaintiff's declaratory relief action to this Court. (Doc. 1.)  On November 2, 2012, MID filed a motion to remand the action to Merced County Superior Court. (Doc. 13.)  Mariposa filed a brief in opposition to MID's motion on December 5, 2012, and MID filed a reply brief on December 12, 2012.  On December 18, 2012, the Court ordered the parties to submit additional briefing.  On January 4, 2013, Mariposa filed a supplemental brief and on January

15, 2013, MID filed a supplemental brief. (Docs. 24, 25.) For the reasons set forth below, the undersigned RECOMMENDS that MID's motion to remand be GRANTED.

## II. FACTUAL BACKGROUND[1]

### A. The 1960 Agreement

MID owns and operates the Merced River Hydroelectric Project (the "Project"), located in Mariposa County. (Doc. 1-1 (Cmplt.), ¶ 9.) The Project impounds waters of the Merced River to form Lake McClure behind the New Exchequer Dam, and Lake McSwain behind the McSwain Dam. (Cmplt., ¶ 9.) The Project provides irrigation waters for agricultural farmland in Merced County, Lakes McLure and McSwain provide recreational benefits to the residents of Merced and Mariposa counties, and the Project includes a hydroelectric power generation output capacity of 103 megawatts. (Cmplt., ¶ 9.)

The contract at dispute between the parties in this litigation arises out of the original permitting and construction of the Project. In December 23, 1954, MID filed applications with the California Water Rights Board (now known as the State Water Resources Control Board) for appropriation of water from the Merced River to be diverted for the Project. (Cmplt., ¶ 10.) The first application (No. 16186) sought to appropriate 900,000 acre feet ("AF") of water per year from the Merced River for irrigation and domestic use. (Cmplt., ¶ 11.) The second application (No. 16187) sought a permit to use the same 900,000 AF per year appropriation for power generation. (Cmplt., ¶ 11.) In March 1955, MID filed an application with the Federal Power Commissioner (now known as the Federal Energy Regulatory Commission ("FERC")) for a preliminary permit for development of the hydroelectric generation components of the Project. (Cmplt., ¶ 12.)

Mariposa objected to MID's water applications to the California Water Rights Board and the application for a license from FERC. Mariposa asserted it had a senior right to use the waters of the Merced River that MID was proposing to use for its Project. (Cmplt., ¶¶ 13, 17.) At that time,

---

[1] The factual background section is drawn primarily from MID's complaint (Doc. 1-1), Mariposa's answer (Doc. 3) and counterclaim (Doc. 4), Mariposa's opposition to MID's motion to remand (Doc. 21), and the materials judicially noticed (Docs. 21-1 - 21-8). This section is set forth only to provide a factual context for the Court's discussion of the issues. To the extent that any factual matters included in the background section are disputed by the parties, this section neither represents formal findings of fact by the Court nor is it intended to be conclusive or binding as to any disputed issue of fact.

Mariposa was analyzing its own plans for water diversion projects, which involved diversions of approximately 100,000 AF of water per year from the South Fork of the Merced River. (Cmplt., ¶ 14.)[2]

MID and Mariposa engaged in extended negotiations, and on March 1, 1960, executed an agreement that Mariposa would withdraw its opposition to MID's applications to the California Water Rights Board and to MID's FERC licensing application (the "1960 Agreement"). (Cmplt., ¶¶ 15-26.) In relevant part, the 1960 Agreement provides:

> 1. [MID] and [Mariposa] will jointly request the State Water Rights Board to grant and issue permits to [MID] under said Applications No. 16186 and 16187 subject to conditions to be set forth or incorporated by reference substantially as follows:
>
> The permits and all rights acquired or to be acquired thereunder are and shall remain subject to depletion of stream flow in the quantities set forth in sub-paragraphs (a), (b) and (c) by future appropriations of water for reasonable beneficial use within Mariposa County; provided such future appropriations shall be initiated and consummated pursuant to law.
>
> (a) From the South Fork of the Merced River a maximum of 500 cubic feet per second of water not to exceed a total of 112,000 acre-feet annually by direct diversion to beneficial use and/or by diversion to storage to be later applied to beneficial use; provided that such future appropriations shall not be made in whole or in part within the payout period of the bonds by which [MID] shall finance the project under those permits, but not to exceed a period of 55 years beyond the date of the beginning of construction of the projects of [MID] as allowed under the permits or extensions thereunder, unless the person or agency making such future appropriation shall compensate [MID] for the loss of power revenue resulting during said period from said appropriation.
>
> . . .[3]
>
> 2. In the event, and only in the event, that the State Water Rights Board shall grant and issue to [MID] permits under said Applications No. 16186 and 16187, substantially as applied for by [MID], and subject to the conditions substantially in conformity with paragraph numbered 1 as hereinabove set forth, and in the event that [MID] shall pursuant to said permits proceed to construct and constructs a project or portion of project from which power is developed on the Merced River substantially as contemplated by [MID], as provided and set forth in its said Applications No. 16186 and 16187, and the proposed amendments thereto, then and in such event [MID] will pay to

---

[2] Mariposa's engineers ultimately concluded that no water resources project was economically feasible at that time. (Cmplt., 14.)

[3] Paragraphs 1(b) and 1(c) involve additional depletion rights to water from Maxwell Creek and Bean Creek, neither of which is relevant for purposes of this motion.

[Mariposa] for use in water development within Mariposa County or investment by [Mariposa] of such funds and the earning of interest thereon during the period in which proper disposition of said funds is under study, the amounts of money at the times and in the manner as specified either in paragraph (a) or (b) of this paragraph numbered 2 at [MID's] option.

. . .[4]

3.      Beginning one year from the date of final payment of all bonds sold by [MID] to finance the project under said applications No. 16186 and No. 16187, [MID] will make annual payments to [Mariposa] each year in the amount and for the period as described in paragraphs (a) and (b) of this paragraph numbered 3.

(a)      Each such payment shall be the greater of either (1) 20% of the gross power revenue from [MID's] completed project on the Merced River earned during the year preceding such payment or (2) 25% of the amount of said gross power revenue after first deducting the actual operation and maintenance costs and expenses of the Merced Irrigation District in its entirety during said preceding year.

(b)      Said annual payments shall continue for either (1) a period of 50 years from their commencement or (2) until the cost of financing construction of a project by [Mariposa] to fully exercise and utilize the water from the South Fork of the Merced River as set forth in paragraph numbered 1 hereof, has been repaid, whichever occurs first.

4.      [MID] agrees, upon condition that permits be issued to it as herein contemplated, not to protest or to oppose any application for permit or license which may be filed by [Mariposa] in the future for the appropriation of water as set forth and contained in the permit conditions set forth in paragraph numbered 1 hereof.

(Cmplt., Doc. 1-2, Exhibit A.)

To finance the construction of the New Exchequer Dam component of the Project, MID issued bonds from the revenues generated by the sale of hydroelectric power from the New Exchequer Dam. (Cmplt., ¶ 37.) MID's repayment of this indebtedness and retirement of the bonds to finance the Project are expected to be concluded on or about July 1, 2014. (Cmplt., ¶ 37.)

**B.      The National Wild and Scenic Rivers Act ("WSRA")**

In 1968, following the parties' 1960 Agreement, Congress enacted the WSRA, 16 U.S.C. §§ 1271-1287, in an effort to identify and protect certain "rivers which, with their immediate

_____

[4] Paragraphs 2(a) and 2(b) of the agreement provide that MID would make annual payments of not less than $100,000 for a total of $5,000,000 beginning one year from the date on which MID received the first payment for power developed by the Project (Paragraph 2(a)), and for an initial one-time payment of $2,148,000 to be made by MID to Mariposa any time prior to the date of commencement of Paragraph 2(a) installment payments (Paragraph 2(b)).

4

environments, possess outstandingly remarkable scenic, recreation, geologic, fish and wildlife, historic, cultural, or other similar values." 16 U.S.C. § 1271. Section 7 of the WSRA provides that "no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration." 16 U.S.C. § 1278(a). Section 7 requires the Secretary of the Interior to evaluate whether a "water resources project . . . would have a direct and adverse effect" on the river's values. When a water resources project is found to have a "direct and adverse effect" on a wild and scenic river, the project cannot be authorized or funded absent congressional intervention. *Id.* "The WSRA also provides that Congress may authorize the Secretary of the Interior or the Secretary of Agriculture to study additional rivers for inclusion in the wild and scenic rivers system [("WSRS")]. After such a study, the Secretary submits a report, along with comments by other federal agencies and by state governors, to the President, who in turn makes a recommendation to Congress. The Congress then decides whether or not to designate the 'study river' as a wild and scenic river." *Town of Summersville, W.Va. v. FERC*, 780 F.2d 1034 (D.C. Cir. 1986) (citing 16 U.S.C. §§ 1275, 1278(a)).

In 1987, the South Fork of the Merced River was designated as "wild and scenic" under the WSRA. Pub. L. No. 100-149, 101 Stat. 879 (Nov. 2, 1987) (codified at 16 U.S.C. § 1274(a)(62)(A) (designating approximately 71 miles of the Merced River's main stem and approximately 43 miles of its south fork as wild and scenic)).[5] MID's complaint alleges that the 1987 legislation deferred wild-and-scenic designation as to an eight-mile segment "of the South Fork of the Merced River," from the town of Briceburg to the point of maximum flood control storage at Lake McClure, and designated that segment as a "study river" for a period of three years. (Cmplt., ¶ 30.) According to MID, the study-river designation was requested by the Mariposa County Board of Supervisors and

---

[5] The National Parks Service ("NPS") "administers the approximately 81 miles of the designated section falling within national park lands. The remainder of the [Merced River's] designated portion is administered by the Secretary of the Interior through the Forest Service and the Bureau of Land Management." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 794-95 (9th Cir. 2003), *as clarified by Friends of Yosemite Valley v. Norton*, 366 F.3d 731 (9th Cir. 2004).

5

Mariposa County Water Agency to permit Mariposa time to evaluate whether it could identify a water resource project that would enable it to use at least a portion of the water rights development opportunity and the construction funding mechanism provided to it pursuant to Paragraphs 1, 2, and 3 of the 1960 Agreement. (Cmplt., ¶ 31.)

Ultimately, Mariposa developed plans to construct the "Saxon Creek Project," using water from the lower Merced River. According to Mariposa, the U.S. Bureau of Land Management ("BLM") granted Mariposa approval under Section 7 of the WSRA to develop the project. (*See* Doc. 21-3, Exhibit A.)

## C.    The 1990 Agreement[6]

The parties' 1960 Agreement provided that Mariposa would not divert its allocated water acreage under the Agreement during the time the bonds were being repaid by MID (Cmplt, Doc. 1-2, Exh. A, Paragraph 1(a) ("such future appropriations shall not be made in whole or in part within the payout period of the bonds . . . unless the person or agency making such future appropriation shall compensate [MID] for the loss of power revenue resulting during said period from said appropriation"). In 1990, the parties modified the 1960 Agreement to secure water rights from the lower Merced River for the Saxon Creek Project. (Doc. 21, 14:23-15:3;[7] Doc. 21-1, Exhibit A; 21-7, Exhibit D.) Under the 1990 Agreement, Mariposa accepted a reduction in its future annual depletion rights from 112,000 AF (as set out in Paragraph 1(a) of the 1960 Agreement) to 70,000 AF in return for being permitted to take 5,000 AF per year from the lower Merced River near Saxon Creek. (Doc. 21, 14:23-15:3; Doc. 21-1, Exhibit A, Doc. 21-7, Exhibit D.)

In relevant part, the 1990 Agreement provides the following:

RECITALS

---

[6] No reference to the 1990 Agreement appears in MID's complaint. However, the 1990 Agreement modified the water allocation reserved to Mariposa under Paragraph 1(a) of the 1960 Agreement. The existence and content of the parties' 1990 Agreement is subject to judicial notice, as set forth below, but the truth of the facts set forth in the 1990 Agreement is not. The 1990 Agreement is cited by Mariposa in its opposition to the motion to remand, and it is relevant to the parties' dispute.

[7] Citation to page numbers in the parties' briefs corresponds to the CM/ECF pagination at the top of each filed document.

A.     On March 1, 1960, [MID] and [Mariposa] entered into a contract entitled "Agreement Between Merced Irrigation District And The County of Mariposa For Settlement Of Water Rights Dispute," which is hereinafter referred to as "the 1960 Agreement[."]  In this 1960 Agreement, the Parties agreed to jointly request the State Water Rights Board, the predecessor of the present State Water Resources Control Board, to grant and issue permits to [MID] under [MID's] Applications 16186 and 16187, subject to various conditions being incorporated in any such permits to allow for depletions of stream flow for beneficial use within [Mariposa].

. . .

C.     [Mariposa] is in need of an additional supply of surface water to serve developments occurring in the Mariposa Public Utility District's service area.

D.     [MID] is willing to allow [Mariposa] to divert and use a portion of the water [MID] is entitled to use under its licenses in exchange for [Mariposa] relinquishing a portion of the rights reserved to it in the 1960 Agreement, all in accordance with the terms and conditions provided for in this contract.

ARTICLE 3 – AMOUNT AND RATE OF DELIVERY

[MID] agrees, subject to the approval of the State Water Resources Control Board and [MID's] Securities Division as provided for in Article 2, to permit the County each year hereafter to divert an amount not to exceed 5,000 acre-feet per year under [MID's] licence 2685.  The maximum instantaneous rate of diversion shall not exceed seven (7) cubic feet per second.

ARTICLE 6 – CONSIDERATION FOR WATER

In consideration for [MID's] agreeing to allow [Mariposa] to divert water under the District's License 2685 as provided for herein, [Mariposa] hereby agrees that during the existence of this Contract the amount of water provided for in subparagraph (a) of paragraph 1 of the 1960 Agreement is reduced from 112,000 acre-feet to 70,000 acre-feet annually.

ARTICLE 7 – COMPENSATION FOR LOSS OF POWER REVENUE

[Mariposa] agrees to compensate [MID] for loss of power revenue resulting from the appropriation of water.  [MID] will notify [Mariposa] of the amount of revenue loss and the County will pay same within thirty (30) days of receipt of said invoice.  [Mariposa] agrees to provide to [MID] such information and statistics as requested regarding water appropriation and use.  The obligation to compensate for loss of power revenue shall remain in force and effect for such period of time as set forth in paragraph 1(a) of the March 1, 1960, Agreement referenced above.

(Doc. 21-7.)

**D.    1992 Amendment to the WSRA**

On October 23, 1992, Congress amended the WSRA to include as a component the eight-mile segment of the lower Merced River that had been previously designated as a study river.  Pub. L. 102-432.  The 1992 amendment specified that

7

> To the extent permitted by, and in a manner consistent with section 7 of this Act (16 U.S.C. § 1278), and in accordance with other applicable law, the Secretary of the Interior shall permit the construction and operation of such pumping facilities and associated pipelines as identified in the Bureau of Land Management right-of-way application CACA 26084, filed by the Mariposa County Water Agency on November 7, 1989, and known as the 'Saxon Creek Project,' to assure an adequate supply of water from the Merced River to Mariposa County.

MID maintains that the designation of the remaining "eight-mile segment of the South Fork of the Merced River" as wild-and-scenic in 1992, and the creation of the corresponding exemption for the Saxon Creek Project at a maximum water withdrawal of 5,000 AF per year, effectively concluded Mariposa's opportunity to develop a water project to fully exercise and utilize water from the South Fork of the Merced River under the parties' 1960 Agreement. (Cmplt., ¶ 33.)

Mariposa contends that the 1987 designation of segments the Merced River as wild and scenic under Public Law 100-149, codified at 16 U.S.C. § 1274(a)(62), included the entirety of the South Fork of the Merced River. The eight-mile study river was located on the Lower Merced River and not on the South Fork.[8] According to Mariposa, in 1992, Public Law 102-432 further amended 16 U.S.C. § 1274(a)(62) to designate the eight-mile segment of the *Lower* Merced River as wild and scenic.[9]

---

[8] Pursuant to 16 U.S.C. § 1274(a)(62)(A), in 1987 Congress designated as wild and scenic "the South Fork of the [Merced] river from its source near Triple Divide Peak in Yosemite National Park to the confluence with the main stem, consisting of approximately 43 miles . . . ." Pub. L. 100-149 provided that the segment of the Merced River that extends "from a point 300 feet upstream of the confluence with Bear Creak downstream to the point of maximum flood control storage of Lake McClure" was to be designated as a study river. In the "Background and Need" section of Senate Report 102-231, it was explained that, "[a]t the time of the designation of the Merced and South Fork of the Merced Rivers, there was concern that the designation of the lower Merced would interfere with the proposed Saxon Creek water supply project for Mariposa County. Subsequently, concern was raised about the possible effect designation of the river would have on the new Exchequer Project operated by the Merced Irrigation District. As ordered reported, S. 549 makes clear that designation of the lower Merced will not interfere with either the construction and operation of the water project or the operation, maintenance and potential relicensing of the New Exchequer Project."

[9] Part of the parties' substantive dispute appears to center on whether the 5,000 AF negotiated for the Saxon Creek Project was part of Mariposa's allocation of water "from the South Fork of the Merced River" under Paragraph 1(a) of the 1960 Agreement. MID maintains in its complaint that the Saxon Creek Project constitutes the "full exercise and utilization of water from the South Fork of the Merced River which Mariposa County can initiate and consummate pursuant to law." (Cmplt., ¶ 38.) Mariposa asserts that the Saxon Creek Project could not constitute an "exercise and utilization" of its water rights under the 1960 Agreement because the Saxon Creek Project is not located on the South Fork of the Merced River, but rather on the lower Merced River near Briceburg, California. (Doc. 4, ¶ 31(c).) Moreover, Mariposa contends that the 1990 Agreement expressly provides that the diversion of water negotiated "was under MID's license 2685, and not the 1960 Agreement. As such, contrary to MID's position, there has not yet been any 'exercise and utilization' of [Mariopsa's] water rights under the 1960 Agreement." (Doc. 4, ¶ 31(g).)

**E.      Retirement of MID's Project Bonds and FERC Relicensing**

To finance the New Exchequer Dam, which was part of MID's Project, MID issued bonds, which will be retired in approximately July 2014. (Cmplt., ¶ 37.) Mariposa has informed MID that, pursuant to the parties' 1960 Agreement, it expects MID to make payments to Mariposa under the 1960 Agreement beginning July 1, 2015 (one year after retirement of the bonds), and continuing for a period of fifty years. (Cmplt. ¶ 42.)

Although not referenced in MID's complaint, Mariposa asserts that MID is also undergoing a fifty-year relicensing application process with FERC. (*See* Docs. 21-4, 21-5, Exhibit B.) According to Mariposa, MID's initial license for its Merced River Hydroelectric Project was issued on April 18, 1964, for a term ending February 28, 2014. In its new application with FERC ("Final FERC Application"), MID seeks a new 50-year license on the grounds that it "anticipates incurring major expenses for implementing protection, mitigation, and enhancement measures, including construction and refurbishing recreation facilities during the next license term." (Doc. 21-4, Exh. B, p. 8.) Mariposa contends it is an interested party to these FERC licensing proceedings; Mariposa is also identified in MID's Final FERC Application as a party that "would likely be interested in or affected by this relicensing." (Doc. 21-4, Exh. B, p. 12.)

According to Mariposa, to obtain relicensing under the Federal Power Act, FERC must evaluate, among other things, the various public interest issues to ensure the best comprehensive use of the Merced River, whether MID can operate the Project to provide efficient and reliable service, whether MID will operate and maintain the Project to provide efficient and reliable service, whether MID will operate and maintain the Project in a cost-effective manner, and other beneficial public uses, including irrigation and water supply. However, as part of the Final FERC Application, Mariposa contends that MID has failed to acknowledge its payment obligations to Mariposa under Paragraph 3 of the parties' 1960 Agreement or Mariposa's water allocation rights under Paragraph 1(a), as modified by the 1990 Agreement. (Doc. 21, 21:26-22:8 (citing 16 U.S.C. §§797(e), 803, 808(a)(2)(F).) Given these omissions, Mariposa argues it has grounds to object to any FERC determination on MID's application for relicensure, and if necessary, challenge FERC's

determination under the Administrative Procedures Act ("APA") or the National Environmental Protection Act ("NEPA").

**F.     Parties' Contract Dispute**

As MID's Project bonds will be fully repaid in approximately July 2014, the parties dispute how the payment provision in Paragraph 3 of the 1960 Agreement should be interpreted and whether the designation of the South Fork of the Merced River as wild and scenic affects the 1960 Agreement.  MID contends that it has informed Mariposa that it believes that the designation of the South Fork of the Merced River as a wild-and-scenic river under federal law precludes further development of water diversions from the South Fork of the Merced River by Mariposa; therefore, the Saxon Creek Project constitutes the full exercise and utilization of water from the South Fork of the Merced River which Mariposa can initiate and consummate pursuant to law.  (Cmplt., ¶ 38.) MID has also informed Mariposa of its position that the facts and circumstances establish that any obligation of MID to make payments to Mariposa pursuant to Paragraph 3(b) of the Agreement will be discharged in full upon MID's repayment of the outstanding indebtedness associated with Mariposa's Saxon Creek Project.  (Cmplt., ¶ 39.)

Mariposa, on the other hand, has informed MID that Mariposa intends to use any payments received from MID under Paragraph 3 of the Agreement for any purpose it chooses, including but not limited to, contributions to Mariposa's General Fund; Mariposa does not intend to restrict the use of such payments to a water resources project. (Cmplt., ¶ 41.) Mariposa has also informed MID that it expects MID to continue making payments for a period of fifty (50) years, notwithstanding Mariposa's alleged inability to construct any project other than the Saxon Creek Project using the waters of the South Fork of the Merced River.  (Cmplt., ¶ 43.)

**G.     MID's Complaint for Declaratory Relief**

Based on the parties' dispute over the payment provisions in Paragraph 3(b) of the parties' 1960 Agreement, MID filed a declaratory judgment action pursuant to California Code of Civil

Procedure § 1060 in Merced County Superior Court.[10]   MID asserts that, because the electrical output of the Project is presently committed by contract to be sold by MID to PG&E through June 30, 2014, MID requires a declaration of its rights and obligations under Paragraph 3 of the Agreement to evaluate and determine its future disposition of the electrical capability of the Project following July 1, 2014.  (Cmplt. ¶ 44.)

In its first cause of action for declaratory relief construing the obligations of the contract, MID asserts that the primary dispute between MID and Mariposa involves the interpretation of the payment provision set forth in Paragraph 3 of the 1960 Agreement.  (Cmplt., ¶ 36.)  MID maintains that a controversy has arisen regarding whether MID is obligated to make payments to Mariposa under Paragraph 3(b)(1) of the 1960 Agreement beginning on July 1, 2015, and continuing for fifty (50) years thereafter. MID seeks a declaration that Mariposa's Saxon Creek Project represents the *only* construction of a project by Mariposa to fully exercise and utilize the water from the South Fork of the Merced River as set forth in Paragraph 1 of the 1960 Agreement that will occur, and that pursuant to Paragraph 3(b)(2) of the Agreement, MID's payment of the costs of financing the Saxon Creek Project will fully and finally discharge any and all obligations of MID under Paragraph 3 of the 1960 Agreement.  (Cmplt., ¶ 45.)

In its second cause of action for declaratory relief based on frustration of purpose of contract, MID seeks a declaration that (1) the enactment of the WSRA and the designation of the South Fork of the Merced River as a wild-and-scenic river have precluded Mariposa from constructing or

---

[10] Section 1060 provides as follows:

Any person interested under a written instrument, excluding a will or a trust, or under a contract, or who desires a declaration of is or her rights or duties with respect to another, or in respect to, in, over or upon property, or with respect to the location of the natural channel of a watercourse, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract.  He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time.  The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment.  The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought.

Cal. Code Civ. Proc. § 1060.

causing to be constructed a project to fully exercise and utilize the water from the South Fork of the Merced River as set forth in Paragraph 1 of the 1960 Agreement, other than the Saxon Creek Project; (2) the purpose of the payments that were to have been made by MID to Mariposa pursuant to Paragraph 3 of the 1960 Agreement have thereby been frustrated; and (3) any and all obligations of MID under Paragraph 3 of the 1960 Agreement have been extinguished as a result. (Cmplt., ¶¶ 46-50.)

In its final and third cause of action for declaratory relief based on impossibility of performance, MID seeks a declaration that (1) the enactment of the WSRA and the designation of the South Fork of the Merced River as a wild-and-scenic river have precluded Mariposa from constructing or causing to be constructed a project to fully exercise and utilize the water from the South Fork of the Merced River as set forth in Paragraph 1 of the 1960 Agreement, other than the Saxon Creek Project; (2) the purpose of the payments that were to have been made by MID to Mariposa pursuant to Paragraph 3 of the 1960 Agreement have thereby been rendered impossible to achieve; and (3) any and all obligations of MID under Paragraph 3 of the 1960 Agreement have been extinguished as a result. (Cmplt., ¶¶ 51-54.)

## H. Mariposa's Notice of Removal and MID's Motion to Remand

On October 5, 2012, Mariposa filed a Notice of Removal. (Doc. 1.) In its Notice of Removal, Mariposa asserts that federal subject matter jurisdiction is proper under 28 U.S.C. § 1331 because all of MID's claims really and substantially involve a dispute or controversy respecting the construction and effect of federal law. (Doc. 1, ¶ 4.) Specifically, the Notice of Removal indicates that "[e]ach of [MID's] claims for relief raise substantial federal issues that are actually disputed; the federal interests at issue are substantial and central to the case; and the exercise of federal jurisdiction will not disturb 'any congressionally approved balance of federal and state judicial responsibility.'" (Doc. 1, ¶ 4 (quoting *Grable & Sons Mental Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).)

On November 2, 2012, MID filed a motion to remand, arguing that the declaratory judgment complaint does not anticipate any potential coercive claim by Mariposa that would provide "arising

under" jurisdiction pursuant to Section 1331.  As such, MID asserts that the Court lacks jurisdiction, and the action should be remanded to the Merced County Superior Court.

### III.    APPLICABLE LEGAL STANDARDS

**A.    Removal Jurisdiction Under 28 U.S.C. § 1441**

"A defendant may remove an action to federal court based on federal question jurisdiction or diversity jurisdiction." *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009) (citing 28 U.S.C. § 1441).  It is presumed, however, "that a cause lies outside [the] limited jurisdiction [of the federal courts] and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal quotation marks omitted).

"Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam).  The defendant always bears the burden of establishing that removal is proper, and the court "resolves all ambiguity in favor of remand." *Hunter*, 582 F.3d at 1042.

The propriety of removal requires the consideration of whether the district court has original jurisdiction of the action,  i.e., whether the case could have originally been filed in federal court based on a federal question, diversity of citizenship, or another statutory grant of jurisdiction. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  If the case is within the original jurisdiction of the district court, removal is proper so long as the defendant has complied with the procedural requirements set forth in 28 U.S.C. § 1446.  If the case is not within the original jurisdiction of the district court, removal is improper.  The absence of subject matter jurisdiction is not waivable by the parties. *See Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6 (1951).

**B.    Federal Question Jurisdiction Under 28 U.S.C. § 1331**

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants . . . . " 28 U.S.C. § 1441(a).  "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  To assess "arising under" jurisdiction pursuant Section 1331, federal courts apply the "well-pleaded complaint" rule under which "federal jurisdiction exists only when

a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc.*, 482 U.S. at 391-92. "A defense is not a part of a plaintiff's properly pleaded statement of his or her claim." *Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998).

In determining whether jurisdiction is appropriate under Section 1331, courts consider whether state or federal law creates the cause of action. The majority of cases coming under the auspices of Section 1331 "are those in which federal law creates the cause of action." *Merrell Dow Pharm., Inc. v. Thompson* ("*Merrell Dow*"), 478 U.S. 804, 809 (1986). In those cases, federal courts unquestionably have federal subject-matter jurisdiction. *Id.*

However, there is a second and "less frequently encountered" category of Section 1331 cases that include state law claims that "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Mental Prods. v. Darue Eng'g & Mfg.* ("*Grable*"), 545 U.S. 308, 312, 314 (2005)*; Merrell*, 478 U.S. at 808 ("a case may arise under federal law 'where the vindication of a right under state law necessarily turn[s] on some construction of federal law'") quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust* ("*Franchise Tax Board*"), 463 U.S. 1, 9 (1983))); *see also Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 674 (9th Cir. 2012). This type of federal-question jurisdiction, however, applies to a "special and small category" of cases, *Empire Healthchoice Assurance v. McVeigh* ("*Empire*"), 547 U.S. 677, 699 (2006), and the "mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," *Merrell Dow*, 478 U.S. at 813.

**C.    Assessing Federal Question Jurisdiction in the Context of a Declaratory Judgment Action Brought Pursuant to State Law**

"Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action . . . which will determine whether there is a federal-question jurisdiction in the District Court." *Public Serv. Comm'n v. Wycoff Co. Inc.*, 344 U.S. 237, 248 (1952). Therefore, to determine federal-question jurisdiction over declaratory judgment actions, courts essentially "reposition the parties in a declaratory relief action by asking whether [the court] would have jurisdiction had the declaratory

relief defendant been a plaintiff seeking a federal remedy." *Standard Ins. Co. v. Saklad*, 127 F.3d 1179 (9th Cir. 1997); *see also Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-73 (1950); *Franchise Tax Board*, 463 U.S. at 19 ("Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.").

*Janakes v. U.S Postal Service*, 768 F.2d 1091 (9th Cir. 1985) is illustrative of this analytical framework. In *Janakes*, a U.S. Postal Service ("Service") employee ("Janakes") was injured while delivering the mail. *Id.* at 1092. He applied for "continuation of pay" ("COP") pursuant to 5 U.S.C. § 8118 of the Federal Employees Compensation Act ("FECA"). *Id.* The Service paid Janakes COP, but subsequently informed him that he would be required to reimburse the Service if he recovered from a third-party tortfeasor for his injuries. *Id.* at 1092-93. Janakes filed an action under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, seeking an interpretation of the FECA provisions defining the government's rights to subrogration and reimbursement. *Id.* at 1093. Janakes asserted that while 5 U.S.C. § 8132 permitted reimbursement of compensation, that term did not include COP because 5 U.S.C. § 8118(e) excluded COP from the definition of "compensation" as provided in 5 U.S.C. § 8101(12). *Id.* However, because Janakes' assertion was made in the face of an anticipated Service action to collect its reimbursement, the Ninth Circuit held that it was an assertion of a federal defense, which does not confer subject matter jurisdiction under Section 1331. *Id.* at 1093 (citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908) (assertion of federal defense does not confer subject matter jurisdiction)). Furthermore, the appellate court recognized that the Supreme Court made clear in *Franchise Tax Board, Wycoff*, and *Skelly Oil* that the DJA itself does not confer federal question jurisdiction. *Id.*

Therefore, to assess whether federal subject matter jurisdiction existed, the appellate court focused "on the nature of a well-pleaded complaint that *the Service* could [have brought] for reimbursement of COP." *Id.* at 1094 (emphasis added). If the Service had such a complaint under a statute or federal common law, then federal jurisdiction would exist "notwithstanding the declaratory judgment plaintiff's assertion of a federal defense." *Id.* at 1093 (citing *Franchise Tax Board*, 463 U.S. at 16-19). The court concluded that the Service could have asserted a claim for

reimbursement under 5 U.S.C. § 8132, conferring the federal court with "arising under" jurisdiction

pursuant to Section 1331 over Janakes' complaint for declaratory relief under the DJA. *Id.* at 1094.

Here, MID's claim seeks declaratory relief under California Code of Civil Procedure § 1060

to construe its payment obligations pursuant to a private contract between MID and Mariposa. As

described above, MID asserts that the WSRA has precluded Mariposa's ability to construct a water

project, other than the Saxon Creek Project, to fully exercise and utilize the water from the South

Fork of the Merced River, and that any payment MID must make to Mariposa under Paragraph 3 of

the 1960 Agreement will be fulfilled, satisfied, discharged and extinguished by MID's payment of

the remaining outstanding indebtedness associated with Mariposa's construction of the Saxon Creek

Project. MID's reliance on the application and interpretation of the WSRA to the parties' 1960

Agreement is a *defense* to a potential coercive contract action by Mariposa. *Janakes*, 768 F.2d at

1093. MID's complaint for declaratory relief thus falls into the category of cases that, but for the

availability of declaratory judgment, the declaratory judgment plaintiff would be required to wait for

the declaratory judgment defendant to bring a coercive suit to enforce its rights. *Franchise Tax*

*Board*, 463 U.S. at 16-19.

Accordingly, to assess its subject matter jurisdiction, the Court must determine whether

MID's declaratory judgment complaint anticipates potential coercive claims that Mariposa could

assert against MID over which this Court would have "arising under" jurisdiction. *Id.*; *Janakes*,

768 F.2d at 1093.[11] The parties dispute whether Mariposa has *any* potential coercive claim that is

*either* (1) created by federal law; or (2) created by state law, but necessarily raises an embedded issue

of federal law. Mariposa contends it has potential coercive federal claims and state-law claims that

necessarily implicate issues of federal law, any of which confer "arising under" jurisdiction pursuant

---

[11] The parties' initial filings and briefs vacillated somewhat in their embrace of this analysis. For example, the Notice of Removal focuses entirely on the federal issues raised on the face of MID's complaint rather than presenting any argument about jurisdiction over Mariposa's potential coercive claims. The full extent of the briefing, however, establishes that neither party disputes that this is the correct analytical framework. (*See, e.g.*, Doc. 21, 17:3-6 ("Where, as here, the Complaint includes only a claim for declaratory relief, federal question jurisdiction is not typically analyzed on the basis of the plaintiff's complaint. Rather, a court analyzes whether the hypothetical 'coercive action' that the declaratory judgment actions seeks to aver 'arises under' federal law."); Doc. 13-2, 10:10-13 ("because determining whether federal question jurisdiction exists under 28 U.S.C. § 1447(c) turns on [Mariposa's] state court breach of contract claims anticipated by [MID's] action for declaratory relief, there is no element of [Mariposa's] anticipated claim for breach of contract that involves federal law").)

to Section 1331. MID argues Mariposa has neither a potential federal cause of action nor a state-law claim that necessarily raises a federal issue, and maintains that federal jurisdiction is lacking under Section 1331.

## IV.    DISCUSSION

### A.    Mariposa's Request for Judicial Notice Should be GRANTED

Mariposa requests judicial notice pursuant to Federal Rule of Evidence 201 as to the following documents:

(1)    **Exhibit A**:    A July 10, 1995, Environmental Assessment for the Saxon Creek Project. (Doc. 21-3.)

(2)    **Exhibit B**:    Volume I of MID's final FERC Application for New License Major Project. Exhibit B consists only of those portions cited by Mariposa in its opposition. (Doc. 21-4, 21-5.)

(3)    **Exhibit C**:    State Water Rights Board Decision No. D979. (Doc. 21-6.)

(4)    **Exhibit D**:    Contract Between MID and Mariposa executed August 14, 1990. (Doc. 21-7.)

(5)    **Exhibit E**:    Mariposa Board of Supervisors Agenda Action Form, Resolution No. 90-385, dated August 14, 1990, adopting the 1990 Agreement. (Doc. 21-8.)

(Doc. 21-2.) MID has not opposed Mariposa's request for judicial notice.

Federal Rule of Evidence 201 provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). Judicially noticed facts often consist of matters of public record. *See, e.g., Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (records and reports of administrative bodies subject to judicial notice); *Toney v. Burris*, 829 F.2d 622, 626-27 (7th Cir. 1987) (city charters and city ordinances subject to judicial notice); and *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a filed complaint as a public record).

Further, the records and reports of administrative bodies are proper subjects of judicial notice, so long as their authenticity or accuracy is not disputed. *See Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)*, abrogated on other grounds*, *Astoria Fed. Savings & Loan Ass'n v. Solimino*, 501 U.S. 103 (1991); *see also Catholic League for Religious & Civil Rights v. City*

*and Cnty. of S.F.*, 464 F. Supp. 2d 938, 941 (N.D. Cal. 2006) (taking judicial notice of San Francisco Board of Supervisors Resolutions). Exhibits C and E are administrative and public records that are subject to judicial notice as to their content and existence, but not for the truth of the matters stated therein. *Lee v. City of L.A.*, 250 F.3d 668, 688-90 (9th Cir. 2001). Exhibit B, MID's final FERC application is a public document filed in association with federal agency proceedings, the content and existence of which is subject to judicial notice. *See, e.g., In re Western States Wholesale Natural Gas*, No MDL 1566, 2007 WL 2178054, at *4 (D.Nev. July 27, 2007) (taking judicial notice of FERC order).[12] Similarly, Exhibit A, a July 10, 1995, Environmental Assessment for the Saxon Creek Project, is a public record and is subject to judicial notice.

In support of Mariposa's request for judicial notice of Exhibit D, the 1990 Agreement between MID and Mariposa, Mariposa filed a declaration of Rene Laroche, Clerk of the Board of Supervisors of the County of Mariposa. The declaration states that the 1990 agreement is a business record maintained by the County of Mariposa and that the contract submitted is a true and correct copy of the agreement between MID and Mariposa that was signed on August 14, 1990. (Doc. 21-1, ¶¶ 3-4.) Pursuant to California Government Code § 6252, any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency[5] is considered a "public record." As a Mariposa County business record, the 1990 Agreement is a public record and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned; there is also no dispute as to its authenticity. The existence and content of Exhibit D, a copy of the 1990 Agreement between the parties, is subject to judicial notice pursuant to Federal Rule of Evidence 201. The Court RECOMMENDS that Mariposa's request for judicial notice be GRANTED.

---

[12] *See also Modesto Irrigation Dist. v. PG&E*, 54 Fed App'x 882 (9th Cir. 2002) (unpublished) (taking judicial notice of FERC application). A copy of MID's final FERC application is publicly available on FERC's docket at http://elibarary.ferc.gov, Submittal 20120227-5055, Docket Number P-2179.

[5] Local Agency is defined in § 6252(a) as including a county or any board, commission, or agency thereof.

**B.      Whether Mariposa Has Any Potential Coercive Claims Created by Federal Law that Confer Jurisdiction Under Section 1331**

### 1.      The Parties' Arguments

Mariposa contends that MID's complaint seeks to avoid federal regulatory decision-making processes under Section 7 of the WSRA as well as potential proceedings under NEPA and the APA challenging agency decisions. (Doc. 21, 18:25-27.)  For example, by seeking a determination that the WSRA precludes further development of water diversions from the South Fork of the Merced River by Mariposa, MID's action is essentially attempting to avoid or precipitate consideration by the Bureau of Land Management or the Forest Service as to whether *any* future Mariposa water resources project is permitted on the South Fork under Section 7 of the WSRA. (Doc. 21, 20:1-5.) Determinations under Section 7 are reviewable under the APA and are often accompanied by environmental review under NEPA, both of which arise under federal law.  (Doc. 21, 20:8-12.)

Additionally, as an interested party to MID's Final FERC Application, Mariposa contends it has the right to submit comments, object to the Project, and petition FERC for a hearing under 18 C.F.R. § 4.34(a), the review of which would be subject to federal jurisdiction. (Doc. 21, 21:3-10.) Mariposa may object to any determination by FERC and/or challenge FERC's decision under the APA or NEPA, both of which are federal claims and provide a basis for federal jurisdiction. Moreover, because MID has failed to acknowledge Mariposa's water allocation rights under Paragraph 1 of the 1960 Agreement or MID's obligation to make payments to Mariposa under Paragraph 3, MID's declaratory judgment complaint is essentially an attempt to adjudicate issues disputed in the FERC proceeding.  (Doc. 21, 21:11-22:27.)

MID responds that, as to Mariposa's purported hypothetical coercive federal claims, there is no private right of action under the WSRA or the Federal Power Act ("FPA") under which Mariposa could bring suit against MID.  As it pertains to Section 7 exemptions Mariposa could seek under the WSRA for a future water project, Mariposa has not submitted a specific request at this point. (Doc. 22, 4:16-18 ("As a threshold matter, it is a mystery how (if at all) a party not applying for a specific permit could 'precipitate consideration by the Bureau of Land Management or the Forest Service' of anything.").)

MID further contends that the potential coercive federal claim that Mariposa asserts arises out of its status as an interested party to MID's FERC licensing proceedings is similar to a claim under the WSRA in that there is no private right of action against MID under the FPA. MID maintains that the FERC relicensing proceedings are not relevant to any issue in any cause of action anticipated by MID's complaint. MID also notes that the FPA provides exclusive jurisdiction for the Courts of Appeals to review and make substantive modifications to FERC licensing orders. (Doc. 22, 5:8-16.)

## 2. Analysis

As discussed below, Mariposa's assertion that it has potential coercive federal causes of action that would confer federal-question jurisdiction under Section 1331 is unpersuasive.

Mariposa maintains that one of the potential actions the complaint seeks to avoid includes federal regulatory decision-making processes under Section 7, as well as potential proceedings under the APA and NEPA, challenging an agency decision under Section 7. Specifically, Mariposa argues that, even though the complaint asserts that the designation of the Merced River as wild and scenic under the WSRA precludes further development of water diversions from the South Fork of the Merced River by Mariposa, the WSRA does not absolutely preclude development of water resources projects on wild and scenic rivers. Instead, Section 7 provides that federal agencies have the jurisdiction to determine whether a specific water resources project is permissible. Thus, by seeking a determination that the WSRA precludes further water diversions from the South Fork of the Merced River, MID's action is essentially attempting to avoid or precipitate consideration by the Bureau of Land Management or the Forest Service as to whether *any* future Mariposa water resources project is permitted on the South Fork under the WSRA. Mariposa further argues that MID seeks a determination in state court that Mariposa is prohibited from building a water resources project due to the South Fork's wild and scenic designation, but state courts have no power to review federal agency decisions nor may they dictate a federal agency's decision that has yet to be made. According to Mariposa, such a dispute does not belong in a state court. (Doc. 21, 18:25-20:23.)

This argument, however, fails to establish how Mariposa could file such claims *against MID*. As MID notes, any Section 7 proceedings that Mariposa may initiate before a federal agency or any

subsequent challenge to a final federal agency decision would involve MID only as a potentially interested/intervening party.  (Doc. 25, 5:17-19 ("it should be noted that for any challenge to a decision made by federal agencies regarding the FPA, WSRA, or NEPA, [MID] is not a defendant or necessarily even a party to such an action").)  The coercive suit Mariposa hypothesizes would thus not be between MID and Mariposa, but rather Mariposa and a federal agency.  Mariposa has not shown how MID would be a proper defendant in such a suit.  "In the declaratory judgment context, whether a federal question exists is determined by reference to a hypothetical non-declaratory suit (i.e., a suit for coercive relief) *between the same parties*; if a federal question would appear in the complaint in this hypothetical suit, federal jurisdiction exists over the declaratory-judgment action."  *See Chase Bank*, 695 F.3d 548, 554 (6th Cir. 2012) (emphasis added).

In *Allstate Ins. Co. v. Nowakowski*, 861 F. Supp. 2d 866 (W.D. Mich. 2012) the district court determined that, to confer jurisdiction, the potential coercive claim hypothesized by the declaratory judgment defendant must be one that is adverse to the declaratory judgment plaintiff.  In that case, the declaratory judgment defendant ("Nowakowski") was involved in an automobile accident; at the time of the accident she was insured under a no-fault automobile insurance policy issued by the declaratory judgment plaintiff ("Allstate"), and she was also an eligible dependent for benefits under a medical plan of Pfizer, Inc. ("Pfizer").  *Id.* at 868.  The Pfizer medical plan expressly provided that it was primary to Nowakowski's coverage under her no-fault automobile insurance policy from Allstate.  *Id.*  The Pfizer medical plan also contained a contractual subrogation and/or reimbursement provision permitting recovery from Nowakowski the sums she might receive in a claim against an at-fault driver and/or under an uninsured motorist policy.  *Id.*

Following the accident, Nowakowski sued the at-fault driver for non-economic damages, and the parties ultimately reached a settlement.  The Pfizer medical plan, which paid Nowakowski's expenses, asserted a subrogation lien against her to recover those expenses from the proceeds of the tort settlement, and Nowakowski requested that Allstate honor the lien, suggesting that Allstate was obligated to indemnify Nowakowski against the Pfizer medical plan's claim.  *Id.* at 868-69.

Allstate filed a declaratory judgment action against Nowakowski in state court, alleging that Nowakowski was only entitled to excess benefits from Allstate, not indemnification of Pfizer's

subrogation claim. *Id.* at 869. Nowakowski removed the action to federal court, claiming that Allstate's claim was preempted by ERISA and fell within the court's "arising under" jurisdiction. *Id.*

Allstate filed a motion to remand, contending that its declaratory judgment action made no allegation seeking judgment or relief under ERISA or any federal law and that the complaint had been improperly removed. *Id.* Nowakowski opposed remand emphasizing that Allstate's declaratory judgment action only arose because of Pfizer's right to reimbursement of benefits paid under ERISA, and any claims by Allstate that were dependent on state law become relevant only as a consequence of the ERISA plan's principal claim. *Id.* Nowakowski then filed a third-party complaint against Pfizer. *Id.*

Nowakowski argued that the court should consider whether she could file a coercive action arising under federal law *against Pfizer* that would confer subject-matter jurisdiction. The court rejected this argument, noting that such a coercive claim was "not between the declaratory judgment parties named in this Notice of Removal. In other words, to find a federal claim upon which original jurisdiction could be predicated, [Nowakowski] would have this Court not only transpose her from declaratory judgment defendant to plaintiff but also name a party other than the declaratory judgment plaintiff as defendant, a proposition for which this Court has not found support in the case law." *Id.* at 872. The court concluded that there was no coercive action Nowakowski could bring *against Allstate* arising under federal law; thus, there was no jurisdiction over the action.

Here, Mariposa asserts that it has potential federal claims arising out of MID's FERC relicensing process. Challenges to a FERC relicensing determination, like challenges to agency decisions under NEPA or the WSRA, would not be adverse to MID, even to the extent that Mariposa's challenge to a FERC determination would ultimately be adverse to MID's interests. Rather, such a coercive claim would be stated against the agency rendering the final agency decision. As noted in *Nowakowski*, there is no authority for the proposition that the Court may consider coercive claims that Mariposa may have against any *other* entity rather than MID. *Id.* at 872; *see also Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990) ("Since it is the underlying cause of action of the defendant against the plaintiff that

is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action

must have been a proper party had the defendant brought suit on the underlying cause of action.").

Moreover, district courts do not have original jurisdiction over challenges to FERC licensing

decisions; such challenges must be brought directly to the Courts of Appeals.  Specifically, the FPA

authorizes FERC to issue licenses for the construction and operation of hydroelectric projects.

16 U.S.C. § 797(e).  Section 313(b) of the FPA provides, in relevant part:

> Any party to a proceeding under this chapter aggrieved by an order issued by the
> Commission in such proceeding may obtain a review of such order in the United
> States Court of Appeals . . . Upon the filing of such petition such court shall have
> jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm,
> modify, or set aside such order in whole or in part.

In *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989),

the court held that, "[b]y its express language, the Act provides *exclusive* jurisdiction of the Courts

of Appeals to review and make substantive modifications to FERC licensing orders."  Thus, the

district court lacked subject-matter jurisdiction to review a FERC order.  *Id.* at 913 ("since the FPA

funnels all challenges to the courts of appeals . . . the district court lacked jurisdiction to review

appellants' claims").  As this Court would not have subject matter jurisdiction over a challenge to

a FERC licensing decision under the FPA, such a claim does not confer subject-matter jurisdiction

as a potential coercive claim in this context.

Furthermore, potential claims that Mariposa may assert to challenge federal agency decisions

are not currently subject to judicial review due to a lack of finality.  Because the WSRA,[6] NEPA,[7]

and the FPA (in connection with hydroelectric licensing)[8] contain no private right of action, the

coercive claims arising under these federal statutes would be limited to judicial review of federal

---

[6] *See, e.g., Center for Biological Diversity v. Veneman*, 394 F.3d 1108, 1110 (9th Cir. 2005) (no private right
of action under the WSRA).

[7] *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) ("A fundamental and oft-
quoted principle of environmental law is that there is no private right of action under NEPA." (citing *Sierra Club v.
Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988)); *Noe v. Metro Atlanta Rapid Transit Auth.*, 644 F.2d 434, 439 (5th Cir.
1981))); *see also Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993) (because NEPA creates
no private right of action, challenges to agency compliance with the statute must be brought pursuant to the APA, which
requires "final agency action for which there is no other adequate remedy in a court").

[8] *See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1957).

agency action (or inaction or unreasonable delay) under the APA. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof."). To obtain judicial review under the APA, the claim must challenge a *final* agency action. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882 (1990); *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990).

Here, Mariposa has no ripened APA claim to challenge a decision made by a federal agency under Section 7 of the WSRA or under NEPA because such agency proceedings have not even been instituted by Mariposa, let alone culminated in final agency action. While MID's FERC relicensing proceedings have begun, this too has not ripened into a final agency decision that Mariposa could currently challenge. Mariposa has presented no case authority for the proposition that non-final hypothetical claims under the APA that are not currently subject to judicial review are among the types of coercive claims that the Court could consider in determining federal-question jurisdiction.

Mariposa cites *First National Bank of Shawnee Mission v. Roeland Park State Bank & Trust* (*"Shawnee Mission"*), 357 F. Supp. 708 (D. Kan. 1973) for the proposition that a potential coercive action includes judicial review of agency decisions. *Shawnee Mission*, which involved the U.S. Department of the Treasury through its independent bureau, the Office of the Comptroller of the Currency ("OCC"), however, underscores the Court's rationale in rejecting Mariposa's argument in this regard. In *Shawnee Mission*, not only was the OCC a declaratory judgment plaintiff in the case, but the OCC had already issued a decision that was subject to judicial review – a decision that was, in fact, being challenged by the defendants concurrently in the United States District Court for the District of Columbia under 5 U.S.C. § 702. *Id.* at 710-11. Thus, the coercive action for judicial review in that case was ripe and was adverse to the declaratory judgment plaintiff, the OCC.

Finally, the potential federal claims Mariposa hypothesizes are not within the scope of claims that can be interpreted as anticipated by MID's declaratory judgment complaint. While Mariposa correctly argues that the disputed issues between the parties may be relevant to the FERC relicensing efforts or future agency proceedings under the WSRA, this does not mean that the complaint anticipates or is attempting to precipitate Mariposa's challenge to the FERC proceedings or a claim

under the APA such that there is a justiciable case or controversy between Mariposa and MID on those grounds. *See generally Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1091-92 (9th Cir. 1992). Further, Mariposa has not established how MID would be a proper defendant in such an action. *See Collins County*, 915 F.2d at 170-71 ("It would be anomalous to allow a party who would not be a proper defendant nor able to intervene of right in a NEPA lawsuit to precipitate a judgment in such a suit between others by filing an action pursuant to the [DJA]."). Moreover, even if such claims could be considered to be anticipated by MID's complaint and MID was able to intervene as a matter of right in a suit by Mariposa against a federal agency, the fact remains that there is currently no final agency action to challenge.

### 3. Conclusion

In sum, hypothetical coercive claims (1) adverse to a federal agency that is not the declaratory judgment plaintiff (MID), (2) challenging a hypothetical federal agency decision where agency proceedings have either not been initiated (*e.g.,* under Section 7 of the WSRA) or have not been completed (*e.g.,* FERC relicensing proceedings[9]) such that they could be considered final and ripe for purposes of judicial review, and (3) that involve issues that are beyond the scope of what is fairly anticipated by the declaratory judgment complaint, do not confer federal-question jurisdiction on the Court. As such, the Court finds that the allegations in the declaratory judgment complaint do not indicate any potential coercive *federal* causes of action by Mariposa against MID. The Court next turns to examine whether Mariposa has any coercive state-law claims that implicate a substantial federal issue that confers "arising under" jurisdiction pursuant to Section 1331.

### C. Whether Mariposa's Potential Coercive State Law Claims Contain Embedded Federal Issues that Confer Jurisdiction Under Section 1331

In the second, less frequently encountered category of Section 1331 cases, lies the "litigation-provoking problem"[10] of state-law claims with embedded federal issues. While state-law claims are not precluded from federal court simply "because they appear[] in state raiment," neither has the

---

[9] The district court has no subject matter jurisdiction over challenges to FERC licensing decisions in any event. *Yeutter*, 887 F.2d at 911.

[10] *See Textile Workers v. Lincoln Mills*, 353, U.S. 448, 470 (1957) (Frankfurter, J., dissenting).

presence of a federal issue created a "password opening federal courts to any state action embracing a point of federal law." *Grable*, 545 U.S. at 314. Asserting jurisdiction over state-law created causes of action that present a federal issue "calls for a 'common-sense accommodation of judgment to [the] kaleidoscopic situations . . . in a selective process which picks the substantial causes out of the web and lays the other ones aside.'" *Grable*, 545 U.S. at 313 (quoting *Bully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 117-18 (1936)).

Although the Supreme Court has considered this second type of "arising under" jurisdiction on multiple occasions,[11] the "welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system" has "kept [it] from stating a 'single, precise, all-embracing' test for jurisdiction over federal issues." *Grable*, 545 U.S. at 314 (internal citations omitted). Nevertheless, in treading again to the "outer reaches"[12] of Section 1331 in considering federal jurisdiction over a state-law quiet title action in *Grable*, the Supreme Court articulated an analytical framework necessary for making "careful judgments about the exercise of federal judicial power in an area of uncertain jurisdiction."[13]

The lawsuit in *Grable* arose from a dispute over real property in Michigan. 545 U.S. at 310. The Internal Revenue Service ("IRS") seized property from Grable & Sons Metal Products, Inc. ("Grable") to satisfy a tax delinquency and sold the property to Darue Engineering & Manufacturing ("Darue"). *Id.* As required by statute, the IRS informed Grable of its intention to sell the property and provided such notice by certified mail, which Grable indisputably received. Although Grable had a statutory right to redeem the property within 180 days of sale, it did not do so, and the IRS issued a quitclaim deed to Darue. *Id.* Five years after the sale, Grable brought a quiet-title action in Michigan state court, claiming that the IRS notice of the pending sale was technically deficient under the statute. *Id.* at 311. The relevant statute required that written notice be "given by the Secretary to the owner of the property [or] left at his usual place of abode or business." *Id.* Because

---

[11] *See, e.g., Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921); *Franchise Tax Board,* 463 U.S. at 9*; Merrell Dow*, 478 U.S. at 807-17.

[12] *Merrell Dow*, 478 U.S. at 810.

[13] *Merrell Dow*, 478 U.S. at 814.

the IRS had provided notice via mail, and not in the statutorily prescribed manner, Grable argued the sale was invalid. *Id*.

Darue removed the action to district court, asserting that Grable's state quiet title action posed a significant federal question as to the required form of notice under federal tax regulations. *Id*. The district court accepted jurisdiction and granted Darue's motion for summary judgment holding that the IRS's substantial compliance with the statute was sufficient. *Id*. Grable appealed to the Sixth Circuit, which affirmed on the jurisdictional issue, finding that "the title claim raised an issue of federal law that had to be resolved, and implicated a substantial federal interest (in construing federal tax law)." *Id*.

On a grant of certiorari, the Supreme Court, in examining its substantial-federal-question precedent, balanced the "commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law" with the role that Congress plays in defining the boundaries of federal subject matter jurisdiction. *Id*. at 312. In accommodating these concerns, the Court held that a federal issue embedded in a state-law claim may give rise to federal question jurisdiction under Section 1331 if (1) the state-law claim necessarily raises a stated federal issue; (2) the federal issue is "both actually disputed and substantial," and so long as (3) the federal forum may entertain the issue "without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id*. at 314. In applying this newly stated framework to the facts of *Grable*, the court determined that the federal tax provision was an important issue of federal law that "sensibly belong[ed] in federal court," and the exercise of federal jurisdiction would "portend only a microscopic effect on the federal-state division of labor." *Id*. at 315.

On the heels of *Grable*,[14] the Supreme Court granted certiorari in *Empire*, which also presented an issue of whether "arising under" jurisdiction existed over a state-law claim with an embedded federal issue. The Court determined *Empire* was "poles apart from *Grable*" and could not "be squeezed into the slim category *Grable* exemplifies." *Empire*, 547 U.S. at 700. *Empire* involved

---

[14] The Court's decision in *Grable* was issued on June 13, 2005; the Supreme Court granted certiorari in *Empire* on January 6, 2006. *See Empire*, 546 U.S. 1085 (Jan. 6, 2006).

a reimbursement claim filed by a health insurance provider (Empire) against the estate of a deceased federal employee to recover $157,309 it had paid out for the decedent's medical care. *Id*. at 687. Empire determined that the decedent's estate had settled tort claims for $3,175,000 against a third party who had allegedly caused the injuries leading to the decedent's death. *Id.* Empire filed suit in district court alleging that the administrator of the decedent's estate was in breach of the reimbursement provision of decedent's health benefits plan. *Id.* In response to a motion to dismiss, Empire asserted the federal court had jurisdiction because federal common law governed the reimbursement claim, and alternatively, the health plan itself constituted federal law. *Id.* at 688. The district court rejected Empire's argument and dismissed the case for lack of subject-matter jurisdiction. *Id.* On appeal, Empire argued that the contract-derived claims implicated uniquely federal interests because the reimbursement directly affected the United States Treasury and the costs of providing health benefits to federal employees, and Congress had expressed its interest in maintaining uniformity among the States on matters relating to federal health-plan benefits. *Id.* The Second Circuit affirmed the district court's decision. *Id.*

The Supreme Court granted certiorari and held that there was neither a federal cause of action that conferred jurisdiction, nor a state-law cause of action implicating a substantial federal issue. In considering the state-law reimbursement claim, the Court noted that the state-law claim in *Grable* centered on the action of a federal agency and its compatibility with a federal statute; the question qualified as substantial, and its resolution was both dispositive of the case and controlling in numerous other cases. *Id.* at 700. In contrast, the reimbursement claim in *Empire* was not triggered by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court and the "bottom-line practical issue [wa]s the share of that settlement properly payable to Empire." *Id.* Additionally, *Grable* presented a nearly "pure issue of law" that could be settled once and for all and would thereafter govern numerous other tax sale cases while Empire's reimbursement claim was "fact-bound and situation-specific." *Id.* 700-01. Thus, while acknowledging that the United States had an "overwhelming interest in attracting able workers to the federal workforce" and "in the health and welfare of the federal workers upon whom it relies to carry out its functions," the Court determined that those interests did not warrant "turning into a

discrete and costly 'federal case' an insurer's contract-derived claim to be reimbursed from the proceeds of a federal worker's state-court-initiated tort litigation." *Id*. at 701.

With *Grable* and *Empire* as two guideposts on the substantial federal question jurisdictional continuum, the Court applies the Supreme Court's analytical framework to this case.

**1.    Whether Any Potential Coercive State Law Claim Necessarily Raises an Issue of Federal Law**

Mariposa argues that MID's declaratory judgment complaint anticipates three state-law contract claims that all necessarily raise an issue of federal law, i.e., interpretation of the WSRA: (1) a claim for anticipatory breach based on MID's non-payment under Paragraph 3 of the 1960 Agreement; (2) a claim for anticipatory breach based on Mariposa's water allocation under Paragraph 1 of the 1960 Agreement; and (3) a claim for breach of the implied covenant of good faith and fair dealing.[15]   The Court first considers whether any of these coercive claims necessarily raises an issue of federal law under the first prong of *Grable*.

**a.    Claim for Anticipatory Breach – Payment under Paragraph 3**

Pursuant to California law, to state a claim for breach of contract, the plaintiff must allege and establish:   (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of defendant's breach. *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 463 (2010).  "Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract.  The repudiation may be express or implied.  An express repudiation is a clear, position, unequivocal refusal to perform; an implied repudiation results from conduct where the promissor puts it out of his power to perform so as to make substantial performance of his promise impossible." *Id.* (internal citations omitted).

---

[15] Interestingly, although Mariposa claims it has potential state-law contract claims against MID, it articulates only a claim for declaratory relief in its counterclaim.  (*See* Doc. 4).

### (i)     The Parties' Arguments

In its motion to remand, MID argues that Mariposa's prospective claim for anticipatory repudiation relates purely to contract construction or interpretation under state law, and none of the elements of such a claim implicates any question of federal law. (Doc. 13-2, 9:3-13.)

Mariposa argues that it has an action for anticipatory breach of contract based on non-payment under the 1960 Agreement and that such a claim necessarily raises an issue of federal law. According to Mariposa, MID ignores the fact that one of the elements of anticipatory breach is an allegation that the plaintiff has the ability to perform. Mariposa asserts that MID defends on grounds that the WSRA precludes Mariposa's performance under the parties' 1960 Agreement. Thus, Mariposa argues that whether it can perform under the WSRA becomes a necessary element of its contract claim. (Doc. 21, 27:7-10 ("Under MID's reading of the 1960 Agreement, to prevail on an anticipatory breach claim, Mariposa would need to show the NWSRA does not bar Mariposa from developing a water resources project on the South Fork.").)

In reply, MID asserts that Mariposa has an alternative theory of recovery predicated entirely on state-law grounds that defeats the *necessity* of reaching the WSRA with respect to an anticipatory breach claim for non-payment under Paragraph 3 of the parties' 1960 Agreement. Specifically, Mariposa maintains in its counterclaim and in its answer to MID's complaint that, regardless of how the Court interprets the WSRA, Mariposa is entitled to payment under Paragraph 3 of the parties' agreement. MID argues that where a state-law claim is supported by a state law theory of recovery not dependent on federal law, the claim itself does not necessarily arise under federal law. (Doc. 22, 6:10-7:13.)

### (ii)     Mariposa's Alternative Theory Defeats the Necessity of Reaching the WSRA as to this Claim

To the extent that Mariposa's performance is required to trigger the payment provision under Paragraph 3 and it is Mariposa's performance that is precluded by the WSRA, MID asserts that Mariposa poses an alternative theory of recovery on this claim that is not predicated on federal law. Mariposa maintains that it is entitled to payment whether or not it can construct a water resources

project at all, i.e., the contract does not require Mariposa to build a water resources project to be entitled to payments.

Under the first prong of *Grable*, if a state-law claim is supported by a theory that contains an embedded federal issue, but the claim can nonetheless be decided on an alternative theory that is not predicated on federal law or a federal issue, then the claim itself does not *necessarily* raise a stated federal issue.

In *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 804-13 (1988), the Supreme Court considered whether the claims at issue stated a cause of action arising under federal patent-law such that the Court of Appeals for the Federal Circuit, rather than the Court of Appeals for the Seventh Circuit, had jurisdiction to decide the appeal. In considering whether there was jurisdiction under Section 1338(a), which confers district courts with original jurisdiction in patent cases, the Court explained that it is not necessarily sufficient that a well-pleaded claim alleges a single theory under which resolution of a patent-law question is essential. Quoting *Franchise Tax Board*, the court reasoned that, if "on the face of a well-pleaded complaint there are . . . reasons completely unrelated to the provisions and purposes of [the patent laws] why the [plaintiff] may or may not be entitled to the relief it seeks, then the claim does not arise under those laws." *Id*. (quoting *Franchise Tax Board*, 463 U.S. at 26). The Court concluded that a claim supported by alternative theories in the complaint may not form the basis for Section 1338(a) jurisdiction unless patent law is essential to each of those theories.

In turning to the claims at issue in the petitioners' complaint,[16] the Court noted that the antitrust count could be readily understood to "encompass both a monopolization claim under § 2 of the Sherman Act and a group-boycott claim under § 1. The patent-law issue, while arguably necessary to at least one theory under each claim, [wa]s not necessary to the overall success of either claim." *Id.* at 810. The Court explained that "the well-pleaded complaint focuses on claims, not theories[; thus,] just because an element that is essential to a particular theory might be governed by federal patent law does not mean that the entire monopolization claim 'arises under' patent law." *Id.* at 811. Even assuming that Colt's patents were an essential element of a monopolization theory under § 2, there was another monopolization theory under which the petitioners could prevail that did not invoke patent law. *Id.* at 811-12. Therefore, since there were "'reasons completely unrelated to the provisions and purposes' of federal patent law why petitioners 'may or may not be entitled to

---

[16] Christianson was a former employee of Colt Industries Operating Corporation ("Colt"). Colt was a manufacturer, seller, and marketer of M16 rifles and its parts and accessories. *Id.* at 804. Colt had originally obtained a license for 16 patents to manufacture the M16's precursor, and continued to patent additional improvements to the weapon. *Id.* Colt had maintained a "shroud of secrecy around certain specifications essential to the mass production of interchangeable M16 parts." *Id.* When Colt licensed others to manufacture M16 parts or hired employees with access to proprietary information, it obligated them not to disclose specifications. *Id.* Christianson signed a nondisclosure agreement while employed by Colt. After leaving Colt's employ, Christianson established his own company and began selling M16 parts. *Id.* The business depended on information that Colt deemed proprietary. *Id.* In a separate action, Colt had joined the petitioners (Christianson and his company) as defendants in a suit against two other companies that had arranged sale of M16s to El Salvador. Evidence had suggested that the petitioners had supplied the companies with certain M16 specifications, and Colt sought an order enjoining them from doing so. After the district court denied the motion and Colt voluntarily dismissed the suit, Colt notified several of the petitioners' current and potential customers that the petitioners were illegally misappropriating Colt's trade secrets and urged them not to conduct business with the petitioners. *Id.* Three days after the petitioners were dismissed from Colt's lawsuit, they brought suit in district court against Colt pursuant to Section 4 and Section 16 of the Clayton Act for damages and sought injunctive and equitable relief for violations of Sections 1 and 2 of the Sherman Act. *Id.* at 805. The petitioners alleged that Colt's tactics had driven them out of business. *Id.* Later, the petitioners amended their complaint to assert a second cause of action under state law for tortious interference with their business relationships. Petitioners eventually moved for summary judgment, raising only a patent-law issue that Colt's patents were invalid from their inception for failure to disclose sufficient information under 35 U.S.C. § 112. *Id.* at 806.

The district court awarded the petitioners summary judgment on both the antitrust and tortious-interference claims (essentially relying on the Section 112 theory) invalidated nine of Colt's patents, declared all trade secrets relating to the M16s unenforceable, enjoined Colt from enforcing any form of trade secret right, and ordered Colt to disgorge to the petitioners all such information relating to technical information about the M16s. Colt appealed to the Federal Circuit, which determined that it had no jurisdiction and transferred the appeal to the Seventh Circuit. The Seventh Circuit concluded that the Federal Circuit was "clearly wrong" about its lack of jurisdiction, and transferred the case back to the Federal Circuit. *Id.* In turn, the Federal Circuit concluded that the Seventh Circuit exhibited "a monumental misunderstanding of the patent jurisdiction" granted to the Federal Circuit, but nonetheless proceeded to address the merits in the interests of justice and reversed the district court. *Id.* at 807. The Supreme Court granted certiorari and concluded that the Federal Circuit in fact *lacked* jurisdiction because the case did not *arise under* federal patent law and the Federal Circuit's decision on the merits, therefore, was invalid; the action was remanded to the Federal Circuit with instructions to transfer the case to the Seventh Circuit.

32

the relief [they] see[k]' under their monopolization claim, . . . the claim does not 'arise under' federal patent law." *Id.* at 812 (quoting *Franchise Tax Board*, 463 U.S. at 26).

The Court then examined whether federal patent law was necessarily an issue with respect to every theory of the group-boycott claim under § 1 of the Sherman Act. *Id.* at 812-13. The Court noted that, "[w]hether or not the patent-law issue was an 'essential' element of [a] group-boycott *theory*, however, petitioners could have supported their group-boycott *claim* with any of several theories having nothing to do with the validity of Colt's patents." *Id.* at 813. Specifically, the Court found that there was a theory under § 1 that the alleged agreement was unreasonable not because Colt had no trade secrets to protect, but because Colt had authorized the petitioners to use them. *Id.* The Court concluded that, "[o]nce again, the appearance on the complaint's face of an alternative, non-patent theory compels the conclusion that the group-boycott claim did not 'arise under' patent law." *Id.* at 813. As there was no claim necessarily arising under Section 1338(a), the Court determined the Federal Circuit had no jurisdiction to review the case, the decision was reversed and remanded with instructions to transfer the case to the Court of Appeals for the Seventh Circuit. *Id.* at 819.

The Supreme Court's analysis under Section 1338(a) in *Christianson* has been routinely applied in determining whether a claim arises under federal law for purposes of Section 1331.[17] For example, in *Long v. Brando Mfg. of Am., Inc.*, 201 F.3d 754, 760 (6th Cir. 2000), the Sixth Circuit concluded that there was no federal question jurisdiction over a state wrongful-termination claim based on alleged violations of public policy expressed in federal statutes because the complaint also set forth public policy violations based on state statutes. Thus, the court concluded that the resolution of a federal question was not necessary or essential to resolution of the wrongful termination claim. *Id.* at 759-60 (citing and relying upon *Christianson*).

Similarly, in *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 818 (4th Cir. 2004), the Fourth Circuit concluded that there was no federal jurisdiction over a wrongful termination claim based on alleged violations of the First Amendment of the United States Constitution and laws of South

---

[17] *Christianson* noted that its analysis under Section 1338 was the identical analysis to determine general federal-question jurisdiction under Section 1331. *Id.* at 808.

33

Carolina. The court explained that, while the complaint referenced the First Amendment, none of the causes of action relied exclusively on a First Amendment violation to establish liability. *Id.* Because the plaintiff could prove that the defendant wrongfully terminated his employment on alternative grounds that did not involve federal law, the claim did not necessarily depend on a question of federal law and "arising under" jurisdiction was lacking. *Id.* at 817 (citing *Christianson*).

Thus, if there is an alternative *theory* of recovery on the claim that does not involve a question or issue of federal law, the *claim* itself cannot be said to necessarily "arise under" federal law. *Christianson*, 486 U.S. at 804-13; *Long*; 201 F.3d at 760; *Dixon*, 369 F.3d at 818*; see also Mulcahey v. Columbia Organic Chems. Co., Inc.*, 29 F.3d 148, 153 (4th Cir. 1994) ("[I]f a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative theory which would not establish such jurisdiction, then federal subject matter jurisdiction does not exist.").

Here, Mariposa maintains a theory of recovery under its claim for anticipatory breach as to non-payment that is not predicated on an interpretation or application of the WSRA. In its counterclaim, Mariposa asserts that, even if MID's interpretation of the WSRA were correct, it would still not affect MID's obligation to make payments under paragraph 3(b). Specifically, Mariposa maintains that

> MID Must Make Payments Under Paragraph 3(b) even if no project is developed. Even if MID could claim the "wild and scenic" designation completely prohibited the County from developing any water resources project on the South Fork of the Merced River (which is inaccurate), MID is nonetheless obligated under the express language of the 1960 Agreement to make payments under Paragraph 3(b), whether or not the County constructs a water resources project on the South Fork of the Merced River.

(Doc. 4, ¶ 31 (h).)

Because Mariposa has advanced an alternative theory of recovery that is not dependent upon an issue of federal law, this hypothetical coercive claim does not necessarily arise under federal law. Mariposa's supplemental brief did not persuasively address MID's argument that Mariposa maintains an alternative theory of recovery for anticipatory breach based on non-payment under Paragraph 3(b). Mariposa argues that MID has invoked the WSRA to defeat the entire contract and that "all claims and counter-claims are inextricably interwoven with the WSRA, APA, NEPA, and the FPA." (Doc.

24, 12:16-17.) However, MID's invocation of the WSRA as a defense to the contract does not confer subject matter jurisdiction. As explained in *Franchise Tax Board*, "since 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." 463 U.S. at 14. Nor does MID's invocation of the WSRA vitiate Mariposa's alterative non-federal theory of recovery for MID's anticipated non-payment under Paragraph 3(b). Rather, Mariposa reasserts its alternative theory of recovery in its supplemental brief by arguing that MID's payments to Mariposa must begin in 2014 under Paragraph 3(b) "regardless of whether Mariposa constructs a water resources project at a less convenient location (or whether Mariposa constructs a water resources project at all)." (Doc. 24, 13:10-12.) Mariposa is essentially asserting that under its interpretation of the contract, it does not have to build any water resource project to be entitled to payments from MID. Thus, Mariposa's anticipatory breach claim for MID's non-payment under Paragraph 3(b) will not *necessarily* be predicated on Mariposa's ability to construct a water resources project under the WSRA.

Finally, while Mariposa asserts that federal law is inextricably interwoven into the entire dispute, this does not provide an adequate ground, by itself, to confer jurisdiction. The mere fact that an issue of federal law may (or even probably will) arise during the litigation of Mariposa's claim for anticipatory breach based on non-payment does not confer federal question jurisdiction. *Franchise Tax Board*, 463 U.S. at 14. For example, in rejecting jurisdiction over a declaratory relief action brought under California Code of Civil Procedure Section 1060 in *Franchise Tax Board*, the Supreme Court noted that "[t]he only questions in dispute between the parties in [the] case concern the rights and duties of CLVT and its trustees under ERISA." *Franchise Tax Board*, 463 U.S. at 14. Not only did the request for declaratory relief "clearly encompass questions governed by ERISA," the declaratory judgment complaint identified "no other questions as a subject of controversy between the parties." *Id.* In fact, the Franchise Tax Board was not able to obtain the relief it sought *"without* a construction of ERISA and/or an adjudication of its preemptive effect and constitutionality – all questions of federal law." *Id.* Nonetheless, this was not dispositive of federal-

question jurisdiction in that case, nor is it in this case. Here, Mariposa has an alternative theory of recovery for MID's anticipated breach for non-payment under Paragraph 3(b) that is *not* dependent on Mariposa's ability to perform under MID's interpretation of the WSRA. Therefore, Mariposa's claim for anticipatory breach for non-payment does not *necessarily* raise a federal issue and fails to satisfy the first prong in *Grable*.

> **b.** **Mariposa's Potential Coercive Claim for Anticipatory Breach – Allocation/Diversion Rights to the 70,000 AF of Water**
>
> **(i)** **Coercive Claim for Anticipatory Breach Based on Allocation Rights is Fairly Anticipated by MID's Complaint**

Mariposa asserts it has a potential coercive action against MID for anticipatory breach of contract based on MID's anticipated refusal to allow Mariposa to deplete 70,000 AF of MID's water allocation under Paragraph 1 of the 1960 Agreement. (Doc. 21, 25:9-12.) Mariposa also notes that Paragraph 4 of the 1960 Agreement specifically requires MID "not to protest or oppose any application for [a] permit or license which may be filed by [Mariposa] in the future for the appropriation of water as set forth and contained in the permit conditions set forth in paragraph 1 hereof." (1960 Agreement; Doc. 21, 25:13-16.) In turn, as renegotiated in 1990, Paragraph 1 provides Mariposa with the right to deplete MID's water allocations for reasonable beneficial use within Mariposa County" in an amount not to exceed 70,000 AF. MID's request for a declaratory judgment that the WSRA precludes further development of water diversions from the South Fork of the Merced River by Mariposa is inconsistent with Mariposa's contractual right to deplete 70,000 AF of water as well as MID's agreement not to protest or to oppose any application for a permit or license which may be filed by Mariposa. Accordingly, MID's complaint anticipates a claim for anticipatory breach resulting from MID's interference with a potential attempt by Mariposa to develop a "water resources project" on the South Fork.

MID argues that its declaratory judgment complaint seeks no determination with respect to its obligations under Paragraph 4 of the Agreement, and MID has posed no question with respect to any future attempts by Mariposa to appropriate water from the South Fork of the Merced River. Therefore, MID asserts there is no controversy involving Paragraph 4 of the Agreement, and

36

Mariposa's "imagined" future claim for anticipatory breach based on Mariposa's diversion rights is not ripe.  (Doc. 22, 8:17-24.)

In its supplemental brief, Mariposa responds that MID's complaint posits a much broader, far-reaching judicial declaration than simply MID's payment obligations under Paragraph 3 of the Agreement.  Specifically, MID is seeking a declaration concerning MID's obligation to allow Mariposa to deplete MID's water allocation from the South Fork of the Merced River and Mariposa's ability to develop a water resources project on the South Fork of the Merced River.  While MID maintains that it poses no question with respect to any future attempts by Mariposa to appropriate water from the South Fork, MID expressly seeks declarations under federal law to terminate Mariposa's right to utilize water from the South Fork.  By seeking such declarations that Mariposa cannot deplete water from the South Fork or develop a water resources project on the South Fork, MID has directly repudiated its duties to allow Mariposa to deplete MID's water allocation from the South Fork as well as MID's obligations under Paragraph 4 of the Agreement.

As to the scope of MID's complaint, Mariposa's argument is persuasive.  The potential coercive actions of the declaratory judgment defendant (i.e., Mariposa) that are assessed for purposes of jurisdiction are those that are fairly anticipated by the scope of the allegations in the complaint seeking declaratory relief.  Therefore, federal-question jurisdiction "exists in a declaratory judgment action if the plaintiff has alleged facts in a well-pleaded complaint which demonstrate that the defendant *could* file a coercive action under federal law."  *Household Bank v. JFS Grp.*, 320 F.3d 1249 1251 (11th Cir. 2003);  *see also Morongo Band of Mission Indians v. Cal. State Bd.*, 858 F.2d 1376, 1384 (9th Cir. 1988) (quoting *Banco de Ponce v. Hindsale Supermarket Corp.*, 663 F. Supp 813, 817 (E.D.N.Y. 1987) ("[F]ederal question jurisdiction exists if at least one of the threatened actions fairly alleged in the interpleader complaint arises under federal law.")).  In *Banco de Ponce*, the court noted that, while the complaint did not "detail the threatened claims of defendants," it did recite "facts that implicitly defined [the claims], and the other papers in the case provided further clarification."  663 F. Supp. at 817.

Here, in seeking a declaration that the WSRA precludes further water diversions from the South Fork of the Merced River by Mariposa County, and that the Saxon Creek Project constitutes

the full exercise and utilization of water from the South Fork which Mariposa County can initiate and consummate pursuant to law, MID has taken the position that Mariposa's diversion rights under the parties' 1960 agreement are effectively extinguished by operation of the WSRA, and MID would have no duty to recognize or otherwise honor Mariposa's diversion right. This necessarily implicates not only whether or to what extent MID's payment obligations are triggered under Paragraph 3(b), but whether Mariposa's diversion right under Paragraph 1, as renegotiated in 1990, has been effectively extinguished by subsequent law. The facts pled in MID's complaint show that it has taken a position adverse to Mariposa's right to deplete *any* water reserved to Mariposa under the parties' 1960 Agreement. While MID notes that it has not pled any facts with respect to Paragraph 4 of the 1960 Agreement or placed Mariposa's allocation right under Paragraph 1 directly at issue, MID's complaint (1) implicitly claims that MID's obligation to recognize Mariposa's diversion right has been effectively extinguished by the WSRA, and (2) expressly asserts that there is no diversion of water from the South Fork that could be initiated and consummated pursuant to law by Mariposa. MID's public litigation position is a sufficient repudiation of Mariposa's diversion rights and an implicit expression that MID will take a position adverse to *any* permits or licenses for diversions of water for which Mariposa applies.

MID's argument that it has not objected to or opposed any application or permit request by Mariposa with respect to the water allocation and therefore such a claim is not ripe is not convincing. A claim for anticipatory breach based on Mariposa's water allocation under the parties' 1960 Agreement is fairly anticipated by MID's declaratory judgment complaint.

**(ii)     A Well-Pleaded Complaint for Anticipatory Breach Would Not Necessarily Implicate the WSRA**

Unlike Mariposa's claim for anticipatory breach with regard to MID's payment obligations under Paragraph 3, there is no alternative state-law theory of recovery for anticipatory breach based on the water allocation rights in Paragraph 1 of the 1960 Agreement. MID notes that Mariposa's answer and counterclaim contend that Mariposa may appropriate water from other points along the Merced River that have not been designated as wild and scenic under the WSRA, and such an

38

assertion is a non-federal alternative theory of relief on Mariposa's anticipatory breach claim based on its water allocation. (Doc. 25, 3:14-4:3). Mariposa contends however, that this is not truly an alternative theory of recovery because the 1960 Agreement expressly entitles Mariposa to deplete water *from the South Fork* of the Merced River. Whether or not Mariposa will be entitled to appropriate water under California law from another point on the Merced River does not provide Mariposa what it bargained for, i.e., water *from the South Fork* of the Merced River. (Doc. 24, 6-18.) Thus, California law does not provide Mariposa an alternative theory of recovery on this anticipatory breach claim.

Turning to the potential anticipatory breach claim Mariposa maintains it has, Mariposa asserts that under MID's interpretation of the WSRA, Mariposa's ability to perform under the parties' 1960 Agreement is predicated on Mariposa's ability to develop a water resource project on the South Fork of the Merced River. In any well-pleaded claim for anticipatory breach, Mariposa would have to allege its ability to perform under the WSRA. In turn, the Court would need to determine if Mariposa could in fact perform under the WSRA or whether the WSRA precludes Mariposa's performance in this regard, as MID maintains. According to Mariposa, because an essential element of its anticipatory breach claim, i.e., its ability to perform, is predicated on the Court's interpretation of federal law, such a claim would necessarily raise a federal issue that is actually disputed. (Doc. 21, 25:9-26:19.)

MID argues that the WSRA is not an essential element of Mariposa's anticipatory breach claim and will arise only as a counterclaim or rejoinder to MID's WSRA defense. Rejoinders that invoke federal law, MID claims, do not provide "arising under" jurisdiction. (Doc. 22, 8:25-9:1.)

The Court is not persuaded that the WSRA is a necessary element of Mariposa's anticipatory breach claim with respect to Mariposa's diversion rights under Paragraph 1 the 1960 Agreement, as modified by the 1990 Agreement. In the 1960 Agreement, Mariposa and MID agreed that in exchange for water diversion rights, Mariposa would drop its opposition to MID's permit request and the parties would jointly request the State Water Rights Board to grant and issue permits to MID under application numbers 16186 and 16187 subject to certain conditions. These permits and licenses were to remain subject to depletion of stream flow in the quantities set forth in Paragraph

39

1(a), (b), and (c) for future appropriations of water for reasonable and beneficial use within Mariposa County, provided such future appropriations were initiated and consummated pursuant to law. (Cmplt., Doc. 1-2, Exh. A.)

Mariposa's consideration for obtaining the diversion rights under Paragraph 1 was predicated on Mariposa's cessation of its opposition to MID's permit applications and joint request that the State Water Rights Board issue MID permits under its applications. Specifically, in its counterclaim, Mariposa alleges that it has "fully performed all its obligations under Paragraph 1 of the 1960 Agreement by jointly requesting, with MID, 'the State Water Rights Board to grant and issue permits to [MID] under said Applications No. 16186 and 16187.'" (Doc. 4, ¶ 15.) While consummation and initiation pursuant to law may be a condition on Mariposa's *use* of any water for which it has a depletion right, Mariposa's entitlement to the water allocation itself is not predicated on any further performance obligations.[18]  This is particularly evident in light of Mariposa's allegation in its counterclaim that it has "fully performed all of its obligations" under Paragraph 1 of the parties' 1960 Agreement.  Moreover, if Mariposa's ability to lawfully consummate and initiate a water project is a part of its performance under the 1960 Agreement, then Mariposa would have the burden to plead and establish how *any* use of the water could be consummated and initiated under *any* law.

As MID correctly notes, Mariposa's assertion that it has a further performance obligation to prove its ability to *use* the water for which it bargained, is essentially converting MID's affirmative defense into a necessary element of Mariposa's claim.  (*See* Doc. 22, 7:4-6 ("This is an apparently attempt to flip MID's WSRA defense and make it an *affirmative element* of its presumptive breach of contract claim.").)  However, Mariposa does *not* have the burden of *disproving* MID's defense as an essential element of its anticipatory breach claim.  The only allegations essential are those required to state a cause of action.  A plaintiff need not anticipate or negate any defense or counterclaim on the part of the defendant and is not bound to show affirmatively in his complaint that the action is *not* barred, that he was *not* guilty of contributory negligence, that he did *not* do

---

[18] The Court reiterates that its discussion of the parties' obligations under the contract is not conclusive or binding as to the merits of the substantive dispute or on the construction or interpretation of the agreement.  The discussion of the parties' 1960 and 1990 Agreements is limited to determining this Court's subject matter jurisdiction and does not represent formal findings with respect to the contract, its language, or the interpretation thereof.

prohibited acts, or that he performed conditions subsequent.   *Transmarine Corp. v. R.W. Kinney Co.,* 123 Cal. App. 411, 421 (1932) (citing 21 Cal. Jur. 61-63.) MID's excuses including frustration and impossibility for its nonperformance, i.e., refusal to recognize Mariposa's allocation rights, are affirmative defenses to the 1960 Agreement.  *See Richter v. Adams*, 19 Cal. App. 2d 572, 576 (1937) (waiver or excuse for nonperformance of a contract is affirmative defense that must be pled in the answer); *see also State Medical Educ. Bd. v. Roberson*, 6 Cal. App. 3d 493, 501 (1970) (an excuse for nonperformance must be pled in the defendant's answer).

A well-pleaded complaint for anticipatory breach would not require an allegation that Mariposa could lawfully initiate and consummate any hypothetical water project pursuant to any law, including the WSRA, especially outside the context of any particular proposed water project. [19] Pleading an ability to use and deplete the water under the WSRA would simply be an anticipation of MID's defense, and not an element of Mariposa's claim.  In this context, the WSRA would only arise as a part of MID's defense to its obligation to recognize, and to not object to, Mariposa's diversion right – which is not an essential element of Mariposa's well-pleaded complaint for anticipatory breach.  *City of New York v. Verizon New York,* 331 F. Supp. 2d 222, 227 (S.D.N.Y. 2004) (claim that was nothing more than a rejoinder to anticipated defense could not, "anymore than a defense itself, provided the basis for federal question jurisdiction").  In sum, the Court finds that interpretation of the WSRA is not a necessary element of Mariposa's potential coercive claim for anticipatory breach.  *See Tax Franchise Board*, 463 U.S. at 13.

       **c.**       **Mariposa's Potential Coercive State Law Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

Mariposa argues that if MID refuses to allow Mariposa to deplete 70,000 AF of MID's water allocation from the South Fork for the reasonable and beneficial use within Mariposa County or otherwise denies the existence of this right, Mariposa has a claim for breach of the covenant of good

---

[19] As a practical matter, pleading an ability to consummate or initiate *any* hypothetical water project under *any* law seems an insurmountable pleading requirement; rather, the invocation of the WSRA as an essential element of Mariposa's claim is an attempt to respond to MID's defense.  It is doubtful that Mariposa would concede it has the burden of disproving MID's affirmative defense at trial.  *See Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 794-95 (1999) (At trial, a defendant raising an affirmative defense has the burden of proving it).

faith and fair dealing.  Mariposa's claim arises from MID's long-standing recognition of Mariposa's right to deplete MID's water allocation (including its formal recognition in the 1990 Agreement), and MID's recent assertion that the WSRA prohibits Mariposa's exercise of those rights.  (Doc. 21, 23:10-25:5.)  Mariposa maintains that to determine whether MID impermissibly attempted, in bad faith, to evade the spirit of the bargain, the Court would as a threshold issue first need to determine whether the designation of the South Fork of the Merced River as wild and scenic under the WSRA precludes further development of water diversions from the South Fork of the Merced River by Mariposa County.  Thus, because an element of MID's bad faith would rest upon the Court's interpretation of federal law, such a claim would necessarily raise a federal issue.  *Id*.

MID argues that Mariposa's claim for breach of the covenant of good faith and fair dealing is mere speculation that MID might oppose some as-yet unfiled application by Mariposa for appropriation of water, in contravention of Paragraph 4 of the 1960 Agreement.  MID maintains that its complaint for declaratory relief seeks no determination with respect to Paragraph 4; therefore, Mariposa's claim in this regard is not ripe.  Moreover, this hypothesized claim is really a counterclaim or rejoinder to MID's anticipatory defenses and thus does not create federal court jurisdiction.  (Doc. 22, 8:17-27.)

**(i)     MID's Complaint Fairly Anticipates a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

As discussed *supra*, MID's argument that Mariposa's coercive claim for breach of the implied covenant is not ripe because MID has not placed Paragraph 4 at issue in its declaratory relief complaint is not persuasive.  In its complaint, MID asserts that the designation of the South Fork of the Merced River as wild and scenic under federal law precludes further development of water diversions from the South Fork of the Merced River by Mariposa.  (Cmplt., ¶ 38.)  MID seeks a declaration that Mariposa's Saxon Creek Project represents the only construction of a project by Mariposa to fully exercise and utilize the water from the South Fork of the Merced River as set forth in Paragraph 1 of the parties' 1960 Agreement that Mariposa can initiate and consummate pursuant to law.  (Cmplt., ¶¶ 38, 45.)  Such a declaration certainly implicates Mariposa's ability to *use* the water for which it bargained under Paragraph 1.  Moreover, MID's assertion that Mariposa can

initiate no lawful use of South Fork water under the WSRA is a clear and public position that *any* request for a permit or license that Mariposa might seek with respect to the use of this water would be precluded by the WSRA, and, therefore, unlawful. While MID's declaratory judgment complaint does not reference Paragraph 4 of the parties' 1960 Agreement, the breadth of the declaration sought by MID directly implicates Mariposa's lawful use of the water. In turn, lawful use of the water is predicated on obtaining licenses and permits, which MID implicitly contends Mariposa cannot obtain and seeks a declaration to that effect. MID's entire position in its declaratory judgment action is a clear and unequivocal statement of opposition to Mariposa's diversion of the waters of the South Fork to which Mariposa has a contractual depletion right.

Because the Court finds such a claim is fairly anticipated by the declaratory judgment complaint, the Court turns to whether Mariposa's hypothesized claim for breach of the implied covenant necessarily implicates an issue of federal law under *Grable*.

  **(ii)**  **A Coercive Claim for Breach of the Implied Covenant Necessarily Implicates an Issue of Federal Law**

Every contract contains an implied-in-law covenant of good faith and fair dealing. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683-84 (1988). "Simply stated, the burden imposed is that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. Or to put it another way, the implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (1990) (citations and quotation marks omitted).

Under California law, to allege a claim for breach of the covenant of good faith and fair dealing, a plaintiff must allege the following elements: (1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantively all of the things that the contract required him to do or that he was excused from having to do so; (3) all conditions required for the defendant's performance had occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff. *See* Judicial

43

Counsel of California Civil Jury Instructions § 325 (2013); *see also Reinhardt v. Gemini Motor Transport*, 879 F. Supp. 2d 1138, 1145 (E.D. Cal. 2012).

"[A]llegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co.*, 222 Cal. App. 3d at 1395. "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable, regardless of the party's motive." *Carma Developers, Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 372 (1992).

Mariposa contends that a potential claim exists for breach of the covenant of good faith and fair dealing based on MID's attempts to frustrate Mariposa's ability to use the water to which it has rights under Paragraph 1 of the parties' 1960 Agreement. Mariposa asserts that whether MID's denial of Mariposa's South Fork depletion right is in bad faith requires application of the WSRA to test whether MID's position represents an impermissible attempt to evade the bargain.

As the Court understands Mariposa's argument, a well-pleaded claim for breach of the covenant would necessarily allege that (1) the parties entered into a contract related to depletion rights under Paragraph 1 of the 1960 Agreement; (2) Mariposa has performed all of its obligations under Paragraph 1 to be entitled to the bargained-for depletion rights to a certain amount of water from the South Fork (*see* Doc. 4, ¶ 15 ("The County fully performed all its obligations under Paragraph 1 of the 1960 Agreement by jointly requesting, with MID, 'the State Water Rights Board to grant and issue permits to [MID] under said Applications No. 16186 and 16187'")); (3) all the conditions for MID's performance have occurred, i.e., MID's obligation to recognize Mariposa's depletion rights and to not oppose any application for a permit or license Mariposa might make with regard to the use of that water; (4) MID's interpretation of the WSRA has unfairly and in bad faith interfered with Mariposa's depletion right; and (5) MID has thereby caused Mariposa to incur damages.

The question is whether, to establish MID's bad faith, Mariposa is necessarily required to show – and, thus, the Court to decide – that MID's interpretation of the WSRA is erroneous, making a federal issue part of an essential element of Mariposa's claim. Neither party has provided any California law relevant to show how bad faith is established by one party's assertion that supervening law has frustrated the purpose of the contract or otherwise obviated or extinguished a party's obligations under the contract.

In *Seaman's Direct Buying Service, Inc., v. Standard Oil Company of California* ("*Seaman's*"), 36 Cal.3d 752, 782-83 (1984), the California Supreme Court considered whether the denial of the existence of a valid contract could constitute a breach of the implied covenant.[20] Seaman's Direct Buying Service, Inc. ("Seaman's") was anticipating operation of a marine fuel dealership and sought to negotiate a lease for a larger marina with the City of Eureka ("City"). *Id.* at 759. To secure the lease, Seaman's was under pressure to show the City that it had a binding agreement with an oil supplier. *Id.* Seaman's negotiated with Standard Oil of California ("Standard"), and upon reaching a tentative agreement with Standard, Seaman's requested evidence of the agreement to present to the City. *Id.* at 760. In the face of Seaman's requests for evidence of a binding commitment, Standard wrote a letter setting forth the terms of the parties' agreement. *Id.* The letter was to be acknowledged and signed by Seaman's, and the parties were to then draft the final agreement. *Id.* The signing by Seaman's of Standard's letter was a momentous occasion, and Standard's representative had exclaimed that it was going to be great doing business with Seaman's and the agreement was a "feather in his cap." *Id.* Seaman's immediately presented the letter to the City, and thereafter signed a 40-year lease for the entire area it sought in the marina. *Id.*

Conditions in the oil industry, however, changed and by the end of 1972 what had been a "buyer's market" had become a "seller's market." *Id.* As a result, Standard adopted a no-new-business policy in January 1973. *Id.* at 761. The formal marine dealership agreement contemplated in Standard's letter was never executed. *Id.* In November 1973, a federal program mandating the

---

[20] *Seaman's* has since been overruled for its holding that *tortious* breach of the implied covenant of good faith and fair dealing exists outside the insurance context in the absence of violation of an independent duty arising from principles of tort law other than bad faith denial of, or liability under, a contract. *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85 (1995).

allocation of petroleum products among existing customers went into effect. *Id.* By letter dated November 20, 1973, Standard informed Seaman's that new federal regulations required suppliers to supply those purchasers to whom they had sold during the base period of 1972. *Id.* Because Standard's records did not show that it had supplied any diesel fuel to Seaman's in 1972, Standard maintained that it was unable to go forward with the financing that was discussed. *Id.* In conversations between the parties, Standard indicated that the new federal regulations were the only barrier to the contract. *Id.* Standard represented that if Seaman's could get the federal government to change the supply order so Standard could supply Seaman's with fuel, Standard would fill the order. *Id.* Standard even supplied Seaman's with the forms necessary to seek a supply authorization from the federal agency and helped complete them. *Id.*

As a result of these efforts, a new supply order was issued on February 4, 1974. *Id.* Standard responded by changing its position contending that no binding agreement with Seaman's had ever been reached. *Id.* Asserting there was no valid contract, Standard successfully appealed the supply order. *Id.* Seaman's also appealed, and the decision was reversed. *Id.* The new decision provided that an order directing Standard to fulfill supply obligations to Seaman's would be issued upon the filing of a copy of a court decree that a valid contract existed between the parties under state law. *Id.* Seaman's requested that Standard stipulate to the existence of a contract, explaining that it would be unable to continue its operation throughout the course of a trial, but Standard refused. *Id.* at 761. Seaman's discontinued operations in early 1975 and filed suit soon after against Standard alleging breach of contract, fraud, breach of the implied covenant of good faith and fair dealing, and interference with Seaman's contractual relationship with the City. *Id.* Among other damage awards, the jury returned a verdict for Seaman's for tortious breach of the implied covenant of good faith and fair dealing and awarded compensatory and punitive damages. *Id.* Standard appealed the verdict. *Id.*

Standard argued that the jury instruction regarding breach of the implied covenant of good faith and fair dealing erroneously allowed the jury to hold Standard liable if it found Standard denied the existence of a valid contract, regardless of whether the denial was in good or bad faith. *Id.* at 770. The court agreed that the instruction and statements to the jury suggested that Standard could

be held liable for breach of the implied covenant for denying the existence of the contract if the denials were subsequently shown to be erroneous, without any finding of bad faith. *Id.* at 772. Thus, an erroneous position with respect to the contract did not, in and of itself, constitute bad faith. *Id.*

Similarly, in the context of insurance contracts and first-party claims, to establish a breach of the implied covenant, the insurer's position regarding liability under the policy must be both erroneous *and* unreasonable to amount to bad faith. *See Brandt v. Super. Ct.*, 37 Cal. 3d 813, 819 (1985). However, "where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of the dispute." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.* ("*Chateau*"), 90 Cal. App. 4th 335, 347 (2001). In other words, erroneous interpretation of the contract is not necessarily dispositive of insurer's bad faith, but the insurer's interpretation of the contract term is nonetheless relevant.

These cases illustrate that establishing breach of the implied covenant requires more than showing a party has advanced an erroneous interpretation of a contract term or an erroneous position with respect to the validity of, or the parties' obligations under, the contract. Here, whether MID's interpretation of the WSRA is erroneous is not dispositive of whether MID acted in bad faith, but it is an essential component of showing bad faith. [21] Establishing that MID's interpretation of the WSRA is erroneous is a necessary element of Mariposa's hypothesized claim for breach of the implied covenant, thereby necessarily raising an issue of federal law under the first prong of *Grable*. Accordingly, the Court next considers whether the remainder of the *Grable* factors are satisfied.

**2.      Whether the Federal Issue is Actually Disputed and Substantial**

An essential element of Mariposa's coercive claim for breach of the implied covenant of good faith and fair dealing will necessarily raise the issue of MID's interpretation of the WSRA. Further, MID's interpretation of the restrictions imposed by the WSRA and its effect on the parties' agreement is actually disputed by the parties. This does not, however, end the analysis under *Grable*.

---

[21] There can be no bad faith claim if the interpretation of the contract or the assertion of the parties' obligations is correct. *Chateau*, 90 Cal. App. 4th at 347.

The Supreme Court has cautioned that the "mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," *Merrell Dow*, 478 U.S. at 813; rather, courts are instructed to consider whether the federal issue is a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum, *Grable*, 545 U.S. at 313.

In considering substantiality under *Grable*, in *Adventure Outdoors, Inc. v. Bloomberg* ("*Adventure Outdoors*"), 552 F.3d 1290 (11th Cir. 2008) the Eleventh Circuit analyzed the distinctions between *Grable* and *Empire* in the context of a state-law claim for defamation. The lawsuit between the parties stemmed from an investigation of firearms dealers conducted by New York City officials regarding the use of illegally purchase firearms in New York. *Id.* at 1293. Believing that gun dealers were permitting illegal straw purchase transactions, the officials used private investigators to stage straw purchases.[22] *Id.* Two of the private investigators entered Adventure Outdoors, a Georgia firearms dealer, and initiated a straw purchase. *Id.* The first investigator selected the firearm, while the second investigator, who had not participated in the selection of the firearm, filled out the paperwork to purchase the gun. *Id.* The store ran a background check on the purchasing investigator (rather than the investigator who selected the firearm). *Id.* Following the investigation, New York City officials held a press conference to announce the filing of civil actions against numerous gun dealers, including Adventure Outdoors. *Id.* At the press conference, the officials accused the gun dealers of violating federal law. *Id.* Adventure Outdoors filed suit in a Georgia state court against New York City and others alleging a claim for, *inter alia*, defamation. *Id.* at 1294. The defendants removed the action to federal district court where they sought to have the action dismissed. *Id.* The plaintiffs filed a motion to remand and opposed defendants' motion to dismiss. *Id.* The district court found that federal jurisdiction was proper, dismissed the plaintiffs' negligence-related claims, denied dismissal on the claims for tortious

---

[22] "Straw purchase transactions involve the purchase of a firearm by an individual legally eligible to make the purchase (the straw) with the intent to immediately transfer the gun to another individual who is legally ineligible to purchase the weapon (the actual purchaser)." *Id*. at 1293.

interference with business relations and defamation, and declined defendants' motion to transfer. The appellate court granted the defendants' request for an interlocutory appeal. *Id.*

In considering its subject-matter jurisdiction on appeal, the court determined that the plaintiffs' defamation claims raised a disputed federal issue. *Id.* at 1298. Plaintiffs alleged that the defendants' statements accusing the plaintiffs of violating federal gun laws constituted defamation. *Id.* The defendants argued that under both federal constitutional law and Georgia law, plaintiffs must prove the falsity of the allegedly defamatory statements to prevail on their claim. The court agreed with the defendants' argument, and concluded that the defamation claim necessarily raised an actually disputed federal issue.

The court reasoned, however, that the nature of the dispute between the parties did not meet *Grable's* substantiality requirement. *Id.* at 1299-1302. The court noted that the interpretation of whether federal law prohibited the plaintiffs' actions would not resolve the defamation claim. Specifically, the plaintiffs contested the defendants' version of the straw transaction, claiming that the videotape of the transaction did not document all the relevant conduct and that the investigators fraudulently induced the salesperson to make the sale. The plaintiffs essentially asserted that they had no knowledge they were participating in a straw purchase, simulated or otherwise. Accordingly, whether federal law precluded simulated straw purchases was not necessarily dispositive to the claims – the claims would turn on an evaluation of the plaintiffs' factual argument. *Id.* at 1300. Further, even if the trial court ruled that participation in simulated straw purchases was illegal under federal law, the plaintiffs were still free to argue, as a factual matter, that they believed the second investigator posing as the straw purchaser was the actual purchaser of the firearm. *Id.* at 1301. Alternatively, if the trial court concluded that federal law did *not* prohibit participation in simulated straw purchases, the plaintiffs would still be required to show that the defendants' statements were not privileged under Georgia state law. *Id.* Thus, while the jury would have to apply federal law to determine the falsity of the defendants' statements, it was not dispositive of the claim, and the need to apply federal law in the context of a state law claim did not suffice to open the "arising under" door. *Id.* at 1300. The court was not persuaded that the relevant federal law regarding straw

purchases was unclear, as the defendants maintained, and determined that a state court making the decision would have clear guidance on the federal law issue. *Id.* at 1300-01.

The court next considered the government's interest in the disputed federal law and the ability of a federal agency to vindicate its action in federal court. The court reasoned that the federal government has a limited interest in a private tort action over private duties tangentially related to federal gun laws, and the federal government would be able to continue to enforce federal gun control laws and regulations without concern for the outcome of the lawsuit. Further, because the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the agency charged with enforcing gun laws, was not a party to the suit, the outcome would not have any res judiciata effect that would apply to ATF or any other arm of federal law enforcement. *Id.* at 1301. The court concluded that, while the case raised an important federal issue, it did not implicate in a significant way the concerns that supported the exercise of federal jurisdiction over the state-law claim in *Grable. Id.* at 1301-02.

The Sixth Circuit has similarly analyzed the substantiality prong of *Grable*, noting that the distinctions between *Grable* and *Empire* implicate the following four factors in considering the substantiality of the federal interest in the case: (1) whether the case includes a federal agency, and particularly, whether that agency's compliance with the federal statute is in dispute; (2) whether the federal question is important (i.e., not trivial); (3) whether a decision on the federal question will resolve the case; and (4) whether a decision as to the federal question will control numerous other cases (i.e., the issue is not anomalous or isolated). *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 570 (6th Cir. 2007) (en banc).

On balance, Mariposa's coercive claim for breach of the implied covenant raises a federal issue more closely analogous to those considered in *Empire*, *Adventure Outdoors*, and *Mikulski* than that considered in *Grable*. Whether MID is erroneous in its interpretation of how the WSRA affects the parties' contract is not dispositive of Mariposa's breach of the implied covenant claim. A breach of the implied covenant requires more than MID's error in interpreting the contract or the WSRA. Even if MID's interpretation of the WSRA is incorrect, Mariposa will still have to establish that MID's actions in taking such a position were unreasonable. Mariposa articulates this well in describing the nature of its claim for implied breach of the covenant. Mariposa asserts that until

50

early 2010, MID staff recognized that MID was obligated to make payments to Mariposa and MID never asserted that it believed Mariposa's right to deplete 70,000 AF of MID's water allocation had been abrogated by the WSRA. Specifically, in 1990, three years *after* Congress passed Public Law 100-149 which designated the entire South Fork of the Merced River as "wild and scenic," MID entered into the 1990 Agreement with Mariposa, reaffirming Mariposa's right to deplete MID's water allocation from the South Fork. Mariposa argues that recently, however, MID began suggesting that the "wild and scenic" designation precluded a Mariposa water supply project on the South Fork.

Mariposa's allegations in this regard are similar to those asserted by Seaman's against Standard. In that case, the legal accuracy of Standard's position with regard to the validity of the contract was not necessarily dispositive of whether its position was advanced in bad faith. Here, it is MID's alleged actions in changing its position and whether its conduct was reasonable or taken in bad-faith that will need to be evaluated – not simply whether MID is incorrect in its interpretation of how the WSRA affects the parties' obligations under the contract. Thus, whether or how the WSRA affects the parties' contract will not necessarily be dispositive of the claim in the manner that the federal issue was dispositive in *Grable*. *See Mikulski*, 501 F.3d at 571 (conformity with 26 U.S.C. § 312(n)(1) may, but will not necessarily, conclude the action, thus federal question is necessarily not dispositive of the action).

Similarly, establishing that MID acted in bad faith in asserting that the WSRA precludes any further lawful diversions of water from the South Fork will be fact-bound and situation-specific and does not involve a pure issue of law that will be resolved for all time, which also sets it apart from *Grable*. *See Chateau*, 90 Cal. App. 4th at 346 (whether particular conduct constitutes bad faith is determined on a case-by-case basis and depends on the contractual purposes and reasonably justified expectations of the parties). This distinguishes this case from *Grable* in an important way – the WSRA's application to this particular contract dispute is unlikely to have broad application to litigants everywhere whereas *Grable* involved a discrete and pure question of law that affected how a federal agency could satisfy a notice provision provided by federal law. In sum, the fact that Mariposa's claim may involve an interpretation of federal law does not mean the federal issue is substantial under the *Grable* and *Empire* framework. *See Adventure Outdoors*, 552 F.3d at 1301-02

(despite involving an interpretation of federal law, federal issue did not implicate in a significant way the concerns that support the exercise of jurisdiction over a state-law claim like the issue presented in *Grable*).

Mariposa asserts that MID's action seeks to usurp the role of a federal agency in evaluating a future water resources project. Mariposa has supplied no authority for the proposition that a federal agency would be bound by a decision as to how the WSRA affects a contract between private parties in the context of a fact-bound claim for breach of the implied covenant of good faith and fair dealing. Mariposa's claim for breach of the implied covenant does not challenge any federal agency action under the WSRA or a federal agency's compliance with the statute. Nothing in deciding Mariposa's claim will preclude a federal agency from administering management of WSRS areas or otherwise fulfilling its statutory role in deciding whether any particular water resource project would have a direct and adverse effect on a wild-and-scenic river. *See* 16 U.S.C. § 1278(a).

Mariposa argues that a dispositive state court interpretation of the WSRA would directly implicate the jurisdictional balance of the state and federal governments over protected rivers. (Doc. 21, 29:11-12.) The WSRA was not intended to affect state jurisdiction over included streams except "to the extent that such jurisdiction may be exercised without impairing the purpose [of NWSRA] or its administration." (Doc. 21, 29:13-15 (quoting 16 U.S.C. § 1284(d).) In drafting Section 1284(d), Congress carefully balanced the respective jurisdictions of the state and federal governments over WSRA waters, and "federal courts have a compelling interest in determining exactly where that jurisdictional balance lies in a consistent and uniform manner." (Doc. 21, 29:15-19.) Further, although Mariposa contends that precisely what constitutes "impairing the purpose" of the WSRA or its administration is an important question of federal law, and is neither delegated nor reserved to the State," it has provided no authority establishing how a determination of whether MID's interpretation of the WSRA is correct for purposes of deciding a claim for breach of the implied covenant will be binding on any federal agency tasked with making decisions under the WSRA and managing WSRS areas. Moreover, while uniformity of decisions on issues of federal law is an important interest, the court's discussion in *Milulski* is instructive:

> While the federal government may have an interest in the uniform application of regulations that relate to the collective of taxes, it has only a limited interest in a private tort or contract litigation over the private duties involved in that collection. The government's ability to collect taxes from an individual shareholder or corporation is not affected by the resolution of the dispute between these two parties. The government is free to interpret and apply the tax code as it sees fit, without the slightest regard for this lawsuit. Unlike *Grable*, in which the IRS's prevailing practice was alleged to violate due process, this case will have no *res judicata* effect that would apply to the IRS, no matter which court, federal or state, decides the case.

*Mikulski*, 501 F.3d at 570.

In balancing the relevant factors, the Court finds that this case is not "substantial" as that term has been defined under the prevailing Supreme Court precedent. *Mikulski*, 501 F.3d at 572. To the extent that this case may touch and concern federal law, state courts are competent to interpret and apply it.

**3.      Whether A Federal Forum May Entertain the Issue Without Disturbing Any Congressionally Approved Balance of Federal and State Judicial Responsibilities**

"Even where a state law claim does necessarily turn on a substantial and disputed question of federal law, removal is subject to a 'possible veto' where exercising federal jurisdiction is not 'consistent with congressional judgment about the sound diversion of labor between state and federal courts governing the application of § 1331.'" *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 675 (9th Cir. 2012) (quoting *Grable*, 545 U.S. at 313).

Although the absence of a private federal right of action is no longer dispositive after *Grable*, it remains relevant to an assessment of the "sensitive judgments about congressional intent that § 1331 requires." *Grable*, 545 U.S. at 319; *see also*, *Shanks v. Dressel*, 540 F.3d 1082, 1093 (9th Cir. 2008). The absence of a private right of action may constitute a "missing welcome mat, required in the circumstances," if it would result in a rule whereby federal jurisdiction would arise wherever a plaintiff sues on a state law that refers to a concept defined by federal law. *See Grable*, 545 at 318.

Here, the WSRA itself provides no private right of action. By authorizing the exercise of federal jurisdiction in this case, the Court would necessarily be finding that jurisdiction was appropriate over any private contract actions affected by or involving the WSRA. While this may not create a flood of federal litigation that would overwhelm the court, it would place a jurisdictional

53

welcome mat at the feet of more than just a single, solitary case. *Mikulski*, 501 F.3d at 573 ("we have not succumbed to some eschatological trembling . . . [but] we are left with the conclusion that finding a substantial federal question in the case we decide today would open the door of the federal courts to significantly more than the solitary case asserting a constitutional challenge, as in *Smith*, 255 U.S. at 214, or the "microscopic effect" portended by the quiet title action in *Grable*, 545 U.S. at 315.").

### 4.    Conclusion

 To the extent that federal law would arise as a necessary element of Mariposa's potential coercive claim for breach of the implied covenant of good faith and fair dealing, the federal issue raised is not "substantial" as defined by the Supreme Court nor does the Court find that a federal forum could entertain Mariposa's hypothetical breach of the implied covenant claim without upsetting the balance of federal and state judicial responsibilities.  The Court finds that none of Mariposa's hypothetical coercive actions necessarily implicate a substantial issue of federal law that could confer "arising under" jurisdiction.

In making this finding, the Court is mindful that "[a]ny notion that the jurisdictional net should be broadly cast by the courts is at odds with the constitutional establishment of a federal government of limited powers." *Palkow v. CSX Transp., Inc.*, 431 F.3d 543, 554 (6th Cir. 2005). The Supreme Court's command that courts exercise jurisdictional restraint is "perhaps even more compelling in the context of removal than in the context of original jurisdiction." *Id.*  As the Court finds there is no subject matter jurisdiction over this action, the Court recommends that the case be remanded to the Merced County Superior Court pursuant to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction.

### V.    CONCLUSION AND RECOMMENDATION

For all of the reasons stated above, the Court RECOMMENDS that Merced Irrigation District's Motion to Remand BE GRANTED and the case be remanded to the Merced County Superior Court.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14)

days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations," and shall not exceed twenty (20) pages; any response to the Objections shall also be limited to twenty (20) pages.

The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    March 4, 2013**                    _____/s/ Sheila K. Oberto_____
                                                UNITED STATES MAGISTRATE JUDGE